**H. Frank FAUCETTE and J. Lawrence Schadler, Appellants/Cross–Appellees,**

v.

**Grace C. CHANTOS and A.J. Chantos & Associates, Inc. d/b/a Sarco of Texas, Appellees/Cross–Appellants.**

No. 14–08–00536–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 23, 2010.

---

Clinard J. Hanby, The Woodlands, for appellants.

Bradley R. Walton, Peter Michael Kelly, James B. Lewis, Susan J. Taylor, Houston, for appellees.

Panel consists of Justices FROST, BROWN, and Senior Justice HUDSON.*

## OPINION

JEFFREY V. BROWN, Justice.

This case involves the failed sale of a company to its employees, who instead resigned from the company, formed their own business, and obtained some of the seller's former lines of business. The company, A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas ("Sarco") and its principal shareholder, Grace C. Chantos, sued former employees H. Frank Faucette and J. Lawrence Schadler, alleging breach of contract, tortious interference with contract, and other claims. Both sides moved for summary judgment on the breach-of-contract claim, and the trial court granted Chantos and Sarco's motion for partial summary judgment on liability for breach of contract.

The case was then tried to a jury on damages for breach of contract and on the tortious-interference claim. The jury awarded Chantos $192,266.00 in damages for breach of contract. The jury found both defendants liable for tortious interference and awarded Sarco $201,407.21 in damages. The trial court granted Fau-

* Senior Justice J. Harvey Hudson, sitting by assignment.

cette and Schadler's motion for judgment notwithstanding the verdict on the tortious-interference claim, but entered a judgment on the breach-of-contract claim for the amount awarded by the jury, attorney's fees, pre- and post-judgment interest, and costs.

On appeal, appellants Faucette and Schadler contend the trial court erred in granting Chantos and Sarco's motion for partial summary judgment on the breach-of-contract claim and in not granting their motion for summary judgment. In resolving this issue, we are asked to consider the infrequent circumstance of a grantor of an option suing the holder of the option for allegedly breaching the option's terms. The appellants also contend that the evidence at trial was legally and factually insufficient to prove damages for breach of contract.

On cross-appeal, Chantos and Sarco contend that the trial court erred in granting Faucette and Schadler's motion for judgment notwithstanding the verdict because Chantos and Sarco presented legally sufficient evidence of each element of tortious interference.

For the reasons explained below, we affirm.

## I

Grace Chantos and her husband, Andy, formed Sarco of Texas, a representative sales agency for plumbing supplies, in 1979. In 1983, they incorporated the agency as A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas. Sarco had contracts with manufacturers in the plumbing, air-conditioning, and heating industry. It was standard in the industry that the contracts with the manufacturers had thirty-day termination provisions. Despite the thirty-day cancellation provision, Sarco represented several manufacturers for twenty years or more. These manufacturers included Elkay, Vanguard, McGuire, and Precision.

Grace and Andy had two children, Linda and Andrew. Andrew worked for Sarco until 1993, when he started his own agency, Sarco Central, in New Braunfels. Linda married Faucette, who worked for Sarco for a few years in the 1980s, returned to Sarco as a salesman in 1994, and remained there until October 7, 2003. J. Lawrence Schadler worked as a salesman for Sarco from 1994 until October 7, 2003. The only other sales employee for Sarco was Lane Malmburg, who started with Sarco in 2002. Malmburg resigned the same day as Faucette and Schadler—October 7, 2003.

For many years, Andy Chantos had suffered from a serious illness. In 2001, he and Grace began to consider retiring and entered into negotiations with Chumley & Associates to sell the agency. Ultimately, Andy and Grace broke off negotiations with Chumley and offered to sell Sarco to Andrew, Faucette, and Schadler.[1] Andrew already owned 260 of Sarco's 1,000 shares, most of which were obtained in 2001 when Sarco acquired Andrew's company, Sarco Central. In the spring and summer of 2001, the parties executed the "Sale and Purchase Agreement" containing the option to purchase all the shares of stock in Sarco (the "contract").

The contract provided that, when Faucette, Schadler, and Andrew acquired forty-nine percent of the company, they would have the option to purchase the remainder of the company from Chantos. The relevant portion of the contract provided:

> At such time as Buyers have acquired a total of forty-nine percent (49%) of the

1. Grace Chantos testified that the reason she and Andy broke off negotiations with Chumley was because Chumley could not offer permanent employment to Faucette and Schadler.

authorized and outstanding shares of the Corporation, Buyers shall have the option to purchase the remaining shares, but only in a lump sum wherein Buyers purchase all remaining shares.

\* \* \*

This Agreement shall terminate unless the Sale and Purchase contemplated is completed in its entirety within thirty-two (32) months from the date of execution of the Agreement.

Andy became gravely ill in late 2001, and after that he and Grace did not actively participate in the operation of Sarco. Faucette, Schadler, and Linda operated Sarco on a day-to-day basis. On August 18, 2002, Andy died. Grace returned to work in May of 2003, and Linda resigned.

On July 22, 2003, Faucette, Schadler, Chantos, Andrew, and attorney Brad Walton met to discuss exercising the option. At the time of the meeting, Faucette owned 118 of Sarco's 1,000 shares; Schadler owned 116 shares, and Andrew owned 260 shares. Thus, together they owned 494 shares, or 49.4 percent of the company.[2] The parties discussed a plan in which Faucette and Schadler were to purchase enough shares from Chantos to bring their ownership to 260 shares each—the same number Andrew already owned.[3] The company would then purchase the remaining shares. The parties also discussed having another meeting within sixty days, apparently to finalize the agreement. But no second meeting occurred, and Faucette and Schadler did not purchase the shares.

Sometime after the July 22 meeting, Faucette and Schadler's business relationship with Grace deteriorated, and after one particularly heated encounter with Grace, they decided to leave Sarco and form their own representative agency. In early September, Faucette discussed leaving Sarco with Schadler and Malmburg. They all resigned on October 7, 2003. About a week or two before they resigned, Schadler went to some of the manufacturers with which Sarco had representative contracts, including Elkay, Vanguard, McGuire, and Precision, and posed a "hypothetical" question asking if he and the others left Sarco, whether they could represent those manufacturers. Also, in late September or early October, Faucette spoke with an attorney about incorporating a new manufacturer's representative company to be called Tri–Rep Sales, Inc. Faucette, Schadler, and Malmburg did not inform Grace of their plans or that they were going to quit. They continued to represent to Grace and Andrew that they intended to complete the purchase of shares in Sarco.

On the day Faucette, Schadler, and Malmburg resigned, Grace was in California. Consequently, the office was left without salespeople and unable to function adequately.[4] That same day, Vanguard sent Sarco written notice that it was terminating its manufacturer's sales representa-

---

**2.** At trial, the testimony reflected that Schadler owned 120 shares, but we are confined to the summary judgment record for purposes of the appellants' first issue.

**3.** Schadler testified that the reason the parties discussed equalizing the shares was that Grace was concerned about Schadler and Faucette having more shares than Andrew. Andrew, however, testified that the change actually helped Schadler and Faucette, who did not have to purchase as many shares.

**4.** Faucette and Schadler testified that they intended to work the entire week after they resigned, but because Grace changed the locks they were unable to do so. Schadler also testified that they continued to take orders for Sarco from Malmburg's home for thirty days, and Sarco was paid the commissions on those orders.

tive contract with the company. Three days later, on October 10, 2003, Elkay also terminated its sales agreement with Sarco. Elkay and Vanguard signed representation agreements with Tri–Rep shortly after that. Grace and Andrew were unable to find experienced salespeople to staff the company, and Sarco was therefore unable to service its remaining lines. After Tri–Rep began operating, its annual sales ranged between $1 million and $3 million.

## II

### Breach of the Option Contract

Grace and Sarco moved for partial summary judgment on their breach-of-contract claim. They alleged that, after Andy passed away, Faucette and Schadler "concluded that it would be far less expensive to simply take the clients and suppliers of [Sarco] rather than to continue with the purchase." They also alleged that Faucette and Schadler persuaded several of Sarco's largest manufacturers and clients to leave Sarco and to sign representation contracts with them. Grace and Sarco contended that Faucette and Schadler breached the option contract when, at the meeting on July 22, 2003, Faucette and Schadler gave notice of their intent to exercise their option to purchase all of the remaining shares of the company, but then failed to complete the purchase.

Faucette and Schadler responded to this motion and filed their own motion for summary judgment on the breach-of-contract claim. In Faucette and Schadler's motion for summary judgment and response, they argued that they did not exercise the option because they did not tender the funds to purchase the shares within the time required by the contract. Consequently, they argued, their failure to timely exercise the option according to its terms legally amounted to nothing more than a rejection of the option.

On November 2, 2006, the trial court granted Grace and Sarco's motion for partial summary judgment. Faucette and Schadler moved for reconsideration, which the trial court denied.

In their first issue, Faucette and Schadler contend that the trial court erred in denying their motion for summary judgment on the breach-of-contract claim and in granting Grace and Sarco's motion.

■ We review the trial court's grant of summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture,* 145 S.W.3d 150, 156–57 (Tex.2004). A movant must establish its right to summary judgment by showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548 (Tex.1985). We take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Joe,* 145 S.W.3d at 157. We review a summary judgment for evidence that would enable reasonable and fair-minded jurors to differ in their conclusions. *Wal–Mart Stores, Inc. v. Spates,* 186 S.W.3d 566, 568 (Tex.2006) (per curiam). When we review cross-motions for summary judgment, we consider both motions and render the judgment that the trial court should have rendered. *Coastal Liquids Transp., L.P. v. Harris County Appraisal Dist.,* 46 S.W.3d 880, 884 (Tex.2001).

■ It is undisputed that, under the terms of the contract, Faucette and Schadler, along with Andrew Chantos, acquired an option to compel Grace to sell the remaining ·shares of Sarco on the stated terms before the option expired. An option is a privilege or right which the owner of property gives another to buy certain property at a fixed price within a certain time. *State v. Clevenger,* 384 S.W.2d 207, 210 (Tex.Civ.App.-Houston 1964, writ ref'd

n.r.e.). An option contract has two components: (1) an underlying contract that is not binding until accepted and (2) a covenant to hold open to the optionee the opportunity to accept. *Comeaux v. Suderman*, 93 S.W.3d 215, 220 (Tex.App.-Houston [14th Dist.] 2002, no pet.); *Hott v. Pearcy/Christon, Inc.*, 663 S.W.2d 851, 853 (Tex.App.-Dallas 1983, writ ref'd n.r.e.).

In their motion for partial summary judgment, Grace and Sarco contended that in the meeting on July 22, 2003, Faucette and Schadler committed to exercise their option to purchase the remaining fifty-one percent of the Sarco shares and agreed that they would make financial arrangements to purchase the shares. Among other things, Grace and Sarco supported their motion with the following testimony from Faucette's deposition:

Q. During that [July 22] meeting did you state that you were ready, willing and able to go forward with the deal to purchase the remaining 51 percent in conjunction with—

A. I believe we did.

Q. —and that would have been in conjunction with Andrew C. Chantos and Lawrence—

A. Correct.

Q. —Schadler.

And you told Grace you were going to go forward with the deal?

A. I believe I did.

Grace and Sarco also pointed to similar excerpts of both Faucette's and Schadler's testimony in which they confirmed that they agreed to exercise the option to purchase the remaining fifty-one percent of the corporation and discussed how they would finance the purchases. Based on Faucette and Schadler's testimony, Grace and Sarco contended that Faucette and Schadler committed to exercise the option to purchase the remaining shares of the company and specifically worked out the details of how the purchase was to be made, including seeking financing. But rather than complete the sale, Faucette and Schadler breached their contractual obligation by failing and refusing to carry through with their agreement to purchase the remaining shares of stock.

 On appeal, Faucette and Schadler argue that the option is not enforceable because their alleged acceptance varied materially from the option described in the contract. They also contend that their alleged acceptance was, at best, a statement of intent to purchase shares sometime in the future, and the sale was not completed by the deadline specified in the contract. Generally, acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement. *Comeaux*, 93 S.W.3d at 220; *Crown Const. Co. v. Huddleston*, 961 S.W.2d 552, 558 (Tex.App.-San Antonio 1997, no writ). A conditional acceptance of an offer is generally considered a rejection and counteroffer. *See United Concrete Pipe Corp. v. Spin–Line Co.*, 430 S.W.2d 360, 363–64 (Tex.1968); *Hutcherson v. Cronin*, 426 S.W.2d 638, 641 (Tex.Civ. App.-Tyler 1968, no writ). But that does not mean the parties to an option cannot modify the option or the terms of the underlying sale by mutual agreement. *See Humble Oil & Refining Co. v. Westside Inv. Corp.*, 428 S.W.2d 92, 94–95 (Tex. 1968); *Wall v. Trinity Sand & Gravel Co.*, 369 S.W.2d 315, 317 (Tex.1963).

Faucette and Schadler argue that their alleged acceptance varied materially from the option contained in the contract because the parties' agreement was changed. Specifically, at the July 22 meeting, Faucette and Schadler expressed an intent only to purchase enough shares from Grace so that they would each own 260 shares, the same number as held by Andrew Chantos. Conversely, the offer contained in the contract provided that the "Buyers" shall have the option to purchase

the remaining shares, "but only in a lump sum wherein Buyers purchase all remaining shares." The "Buyers" are defined in the contract as Andrew C. Chantos, H. Frank Faucette, and J. Lawrence Schadler. Thus, Faucette and Schadler argue, the option called for three buyers, Andrew, Faucette, and Schadler, to make a lump-sum purchase of fifty-one percent of the shares of stock in Sarco. But the summary-judgment evidence showed that the alleged acceptance called for Faucette to purchase 142 shares, Schadler to purchase 144 shares, Andrew to purchase nothing, and Sarco itself to purchase the remaining 220 shares.[5] Consequently, they contend, their alleged acceptance amounted to nothing more than a counteroffer and rejection of the option contained in the contract. See Antonini v. Harris County Appraisal Dist., 999 S.W.2d 608, 610–11 (Tex.App.-Houston [14th Dist.] 1999, no pet.) ("Acceptance must be identical with the offer in order to make a binding contract.").

It is undisputed that Grace owned fifty-one percent of the company's shares, her son Andrew owned twenty-six percent of the shares, and Faucette and Schadler owned the rest. The summary-judgment evidence shows that at the July 22 meeting, Faucette and Schadler agreed to exercise the option to purchase Grace's shares. That Andrew, one of the "Buyers" defined in the contract, was not purchasing any additional shares does not raise an inference defeating summary judgment. The intended purpose of the option was to enable the majority shareholders (now Grace) to relinquish ownership of the company to the other shareholders (Andrew, Faucette, and Schadler) once they ac-

quired forty-nine percent of the company. The evidence conclusively shows that the parties expressed an agreement consistent with this purpose. The arrangement to equalize the share ownership and to have the company itself buy the remaining shares merely goes to the manner in which the other shareholders would accomplish the agreed-upon purpose of buying out Grace's ownership interest. On these facts, therefore, there was no counteroffer and rejection that rendered the agreement unenforceable.

Faucette and Schadler argue, however, that the alleged acceptance was not made in the manner or within the time the contract required. They point to the contract's provision that the option requires the buyers to "purchase" all of the remaining shares and to do so "only in a lump sum." Therefore, they contend, the contract required them to actually tender performance, not merely to announce an intent to perform without ever tendering any money. As additional support for their interpretation of the contract, Faucette and Schadler point to the "Term of Agreement" provision, which states that the contract "shall terminate unless the Sale and Purchase contemplated in its entirety within thirty-two (32) months from the date of execution of the Agreement." This language, they contend, requires that actual payment be made prior to the end of thirty-two months to exercise the option. Thus, their mere statements at the July 22 meeting that they were ready to purchase some of Grace's stock were not sufficient to accept the option.

In their motion, Grace and Sarco relied on a line of cases holding that unless an

5. Faucette's testimony included the following exchange:
Q. So the plan was as of this July 22 meeting, was for you, Lawrence Schadler and Andrew C. Chantos to all equalize the number of shares you owned at 26 percent

each and for Sarco of Texas to purchase the remaining 22 percent. Is that correct?
A. I believe that is correct.
Schadler also confirmed this plan in the excerpts of his testimony attached to Grace and Sarco's motion.

option to purchase contains provision to the contrary, the optionee is only required to notify the optionor prior to the expiration of the option period, and then tender performance within a reasonable time thereafter to exercise the option. *See, e.g., English v. English,* 44 S.W.3d 102 (Tex. App.-Houston [14th Dist.] 2001, no pet.); *Maxwell v. Lake,* 674 S.W.2d 795, 798 (Tex.App.-Dallas 1984, no writ); *San Antonio Joint Stock Land Bank v. Malcher,* 164 S.W.2d 197, 200 (Tex.Civ.App.-San Antonio 1942, writ ref'd w.o.m.). In *English,* for example, an ex-wife notified her ex-husband that she was exercising the option contained in the parties' divorce decree to buy out her ex-husband's interest in their homestead within the option period, but she did not complete the purchase before the option expired. *Id.* at 104. This court held that "where the option instrument is silent regarding the method of exercising the option, giving timely notice to the optionor and subsequently tendering performance within a reasonable time is sufficient to exercise the option." *Id.* (citing *Maxwell v. Lake,* 674 S.W.2d at 798). Grace and Sarco argue that, because the option provision of the contract did not specify the manner or method in which they were to be notified that the option was accepted, Faucette's and Schadler's agreement to purchase the remaining shares of stock at the July 22 meeting was sufficient to exercise the option.

On appeal, Faucette and Schadler argue that these cases stand merely for the proposition that unless the option provides otherwise, acceptance of the option does not require the optionee to tender actual payment before the option expires; they do not hold that an optionee may accept an option by mere notice without ever tendering payment. Thus, Faucette and Schadler contend, an optionee who never tenders performance cannot enforce the option. They also argue that the option in

this case does "provide otherwise" because it requires the purchase be completed in its entirety according to its terms and within the specified deadline. In any event, they contend that because they never tendered payment within the option period, they never exercised the option. As support, Faucette and Schadler cite *Kruegel v. Berry,* 75 Tex. 230, 9 S.W. 863, 864–65 (1888), in which the supreme court concluded that a lessee who had an option to purchase leased land for a specified amount within two years "had the right at any time during the term of the lease . . . to purchase the land by paying the consideration agreed upon," but because he did not seek to enforce the option before the expiration of the two-year period, and the land was then sold to a third party, the lessee was not entitled to specific performance of the option contained in the lease. *Kruegel* did not involve a situation in which the lessee gave notice of an intent to exercise the option but failed to pay the consideration for the option within the option period. And, the court in *Kruegel* did not address whether acceptance alone is insufficient to exercise an option.

■■■ In this case, as in all option cases, the option contract itself is an offer by the optionor to the optionee. By agreeing to purchase the remaining shares at the July 22 meeting—an arrangement that fulfilled the intended purpose of the option—Faucette and Schadler elected to accept the offer. The effect of this election is the formation of a contract that binds both the optionor and the optionee:

Election is the act of the optionee which converts the option contract into a binding promise on the part of the optionor to sell. The effect of a timely and proper election under the contract, and of a timely and proper acceptance of an offer, is the same, in that the option contract, on the one hand, and the offer on the other, are turned into a bilateral

contract. *Having exercised the option by election the optionee must then proceed to perform the conditions of the option contract in order to complete the transaction.*

*Ferguson v. von Seggern,* 434 S.W.2d 380, 385 (Tex.Civ.App.-Dallas 1968, writ ref'd n.r.e.) (emphasis added); *see also Hott,* 663 S.W.2d at 854 ("When the optionee gives notice or otherwise complies with the terms and conditions of the option ... a bilateral executory contract is formed, one party having the duty to convey and the other the duty to pay."). The cases in which an optionee exercises the option and thus binds the optionor to perform are legion. *See, e.g., Sinclair Refining Co. v. Allbritton,* 147 Tex. 468, 218 S.W.2d 185, 188–90 (1949); *Smith v. Hues,* 540 S.W.2d 485, 490 (Tex.Civ.App.-Houston [14th Dist.] 1976, writ ref'd n.r.e.); *Luccia v. Ross,* 274 S.W.3d 140, 149–50 (Tex.App.-Houston [1st Dist.] 2008, pet. denied); *Odum v. Sims,* 609 S.W.2d 881, 882 (Tex. Civ.App.-San Antonio 1980, no writ); *Kenver Corp. v. Robinson,* 492 S.W.2d 317, 319–20 (Tex.Civ.App.-Beaumont 1973, writ ref'd n.r.e.); *Giblin v. Sudduth,* 300 S.W.2d 330, 332–34 (Tex.Civ.App.-Austin 1957, writ ref'd n.r.e.); *see also El Paso Natural Gas Co. v. W. Bldg. Assocs.,* 675 F.2d 1135, 1139–41 (10th Cir.1982) (holding optionee's acceptance of option without tender of purchase price created mutually binding contract entitling optionee to specific performance). But the acceptance of an option ascribes contractual duties to the optionee in the same way that it does the optionor. By notifying Grace and Sarco of their intent to exercise the option, Faucette and Schadler entered into a bilateral contract and became obligated to perform.

*See Ferguson,* 434 S.W.2d at 385. And when they failed to perform by refusing to complete the purchase of the remaining shares, they breached the contract.

Because we affirm the trial court's grant of summary judgment in favor of Grace and Sarco, we do not address Faucette and Schadler's competing motion for summary judgment.

We overrule Faucette and Schadler's first issue.

*Damages for Breach of Option Contract*

In their second issue, Faucette and Schadler contend that the evidence is legally and factually insufficient to prove damages for breach of contract. They argue that Grace was awarded what she would have received from the sale of the remaining shares of Sarco without any evidence of the value of the shares she should have surrendered in the transaction. According to Faucette and Schadler, proper proof of damages required not only evidence of the amount Grace would have received had the sale of the shares been performed, but also evidence of the value of the shares she would have surrendered in the transaction. *See Miga v. Jensen,* 96 S.W.3d 207, 215 (Tex.2002) (holding damage award resulting from a breach of an agreement to purchase securities is the difference between the contract price and the fair market value of the asset at the time of the breach); *Holt Atherton Indus. Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992) (evidence of lost income was legally insufficient to prove lost profits). They also argue there was undisputed evidence that she retained the shares, sold assets of the company, and kept the proceeds for herself.[6]

---

6. Faucette and Schadler also complain that the judgment was erroneously rendered jointly and severally against them for breach of contract. They state in their brief that even if they were required to exercise the option for the entire option price, Grace was entitled, at most, to an award of $82,472 against Faucette and $81,705 against Schadler. But Faucette and Schadler do not provide any argument or authority to support their contention that the

When examining a legal-sufficiency challenge, we review the evidence in the light most favorable to the challenged finding and indulge very reasonable inference that would support it. *City of Keller v. Wilson,* 168 S.W.3d 802, 822 (Tex.2005). We credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. The evidence is legally sufficient if it would enable reasonable and fair-minded people to reach the verdict under review. *Id.*

When examining a factual-sufficiency challenge, we consider and weigh all the evidence, both supporting and contradicting the finding. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.1998). We set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986).

▮▮▮ Initially, we note that the jury was asked to determine Grace's damages for the breach of contract the court had found. The question was worded as follows:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Grace C. Chantos for her damages, if any, that resulted from such breach of contract?

Consider the following elements of damages, if any, and none other:

The amount Grace C. Chantos would have received for the sale of her 502 shares of the business corporation if H. Frank Faucette and J. Lawrence Schadler had not breached the Sale and Purchase Agreement.

At the charge conference, Faucette's and Schadler's only objection to this question

was that the answers should have been separate for each of them. They did not complain that the instruction's measure of damages was improper or otherwise object to the instruction. Therefore, we measure the sufficiency of the evidence against the language in the charge. *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) (holding, when no objection is made to jury issue, sufficiency of the evidence is measured against charge given by court rather than some other unidentified law); *Kroger Co. v. Brown,* 267 S.W.3d 320, 323 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (measuring sufficiency of damages evidence against commonly understood meaning of undefined term used in charge); *see also Equistar Chems., L.P. v. Dresser–Rand Co.,* 240 S.W.3d 864, 868 (Tex.2007) (holding argument that charge submitted improper measure of damages was waived by failure to object in trial court); *Tribble & Stephens Co. v. Consolidated Services, Inc.,* 744 S.W.2d 945, 949 (Tex.App.-San Antonio 1987, writ denied) (holding failure to raise issue of improper measure of damages in trial court waived review of complaints that proper measure of damages was not submitted to jury and that plaintiff failed to present evidence on the proper measure).

▮▮▮ Here, the jury was instructed that the measure of damages is the amount of money Grace "would have received for the sale of her 502 shares" of the company had Faucette and Schadler not breached the contract. Under the terms of the contract, the price per share was $383. The jury awarded $192,266, which is exactly the share price multiplied by 502. Therefore, the jury's answer is supported by legally sufficient evidence. And, although Faucette and Schadler com-

trial court erred in rendering a judgment against them jointly and severally; therefore,

it is waived. *See* Tex.R.App. P. 38.1(i).

plain that Grace received a double recovery because she was awarded the sales price while retaining the shares, the jury was not asked to determine fair market value of the shares or to calculate Grace's net profits on the sale of the shares. The evidence, measured against the question asked, is also factually sufficient to support the jury's award.

Having overruled Faucette and Schadler's second issue, we next turn to Grace and Sarco's cross-appeal.

## III

### Tortious Interference

At trial, the jury found Faucette and Schadler tortiously interfered with Sarco's manufacturers' representative contracts with Elkay and Vanguard. In a single issue, Sarco contends the trial court erred in granting Faucette and Schadler's motion for JNOV on the tortious-interference findings because Sarco presented legally sufficient evidence of each element of that cause of action.

 A trial court may disregard a jury's verdict and render a judgment notwithstanding the verdict if no evidence supports one or more of the jury's findings or if a directed verdict would have been proper. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003). The final test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). To determine whether the trial court erred in rendering a JNOV, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Id.* at 807.

 To prevail on a tortious-interference claim, Sarco was required to prove: (1) contracts existed which were subject to Faucette and Schadler's interference; (2)

Faucette and Schadler willfully and intentionally committed acts of interference; (3) Faucette's and Schadler's acts proximately caused damages; and (4) actual damages or loss occurred. *Browning–Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 926 (Tex.1993); *Rodarte v. Investeco Group, LLC*, 299 S.W.3d 400, 411 (Tex.App.-Houston [14th Dist.] 2009, no pet.).

Sarco argues that the evidence shows that Faucette and Schadler intentionally destroyed Sarco's business for their own financial gain. Specifically, Faucette and Schadler, while receiving salaries and bonuses from Sarco to enable them to purchase the company and promising they were continuing with the purchase, persuaded the manufacturers who had been with Sarco for over twenty years to terminate their contracts so they could do business with Faucette and Schadler's new company, Tri–Rep. Further, Faucette and Schadler planned their method of departure from Sarco—resigning without notice when Grace was out of the state and taking the only other salesman with them—knowing it would cause great harm to Sarco.

Faucette and Schadler respond that Sarco's claim is not one for tortious interference with *existing* contracts, but is actually one for tortious interference with *prospective* contracts. They point out that Elkay and Vanguard complied with their contracts, giving Sarco the contractually required thirty-day notice of termination, and that Sarco continued to act as manufacturer's representative for those thirty days. According to Faucette and Schadler, Sarco is actually seeking to recover damages for the loss of the *prospect* that Elkay and Vanguard would continue to renew the manufacturer's representative contracts indefinitely.

This distinction is significant because in *Wal–Mart Stores, Inc. v. Sturges*, 52

S.W.3d 711, 726 (Tex.2001), our supreme court held that to prevail on a claim for tortious interference with prospective contracts the plaintiff must additionally prove that the defendant's conduct was "independently tortious or wrongful." The *Sturges* court explained that conduct that is merely "sharp" or perceived as "unfair competition" is not actionable as the basis for this tort. *Id.* The plaintiff is not required to prove an independent tort; instead, the plaintiff need only establish that the defendant's conduct would be actionable under a recognized tort. *Id.*

█ Thus, after *Sturges,* the following formulation of the elements of the tort has been adopted:

(1) a reasonable probability that the parties would have entered into a contractual relationship;

(2) an "independently tortious or unlawful" act by the defendant that prevented the relationship from occurring;

(3) the defendant did such act with a conscious desire to prevent the relationship from occurring or knew that the interference was certain or substantially certain to occur as a result of his conduct; and

(4) the plaintiff suffered actual harm or damage as a result of the defendant's interference.

*See Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 860 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). Faucette and Schadler contend that Sarco does not even attempt to meet the burden of showing independently tortious conduct.

Sarco contends that *Sturges* does not apply because its claims were brought for tortious interference with existing contracts. Sarco points out that that it proved the existence of its contracts with the manufacturers and that Faucette and Schadler deprived Sarco of the benefits of those contracts. Sarco further points out that under Texas law the terminable-on-

notice or terminable-at-will status of a contract is not a defense to an action for tortious interference. *See Juliette Fowler Homes, Inc. v. Welch Assocs., Inc.,* 793 S.W.2d 660, 666 (Tex.1990) (terminable-on-notice contract); *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 689 (Tex.1989) (terminable-at-will contract). Both *Juliette Fowler Homes* and *Sterner* instruct that "[u]ntil a contract is terminated, it is valid and subsisting, and third persons are not free to tortiously interfere with it." *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 666; *Sterner,* 767 S.W.2d at 689 (citing RESTATEMENT (SECOND) OF TORTS § 766 cmt. g (1979)); *see also Knox v. Taylor,* 992 S.W.2d 40, 57–58 (Tex.App.-Houston [14th Dist.] 2001) (rejecting terminable-on-notice status of contract as defense to tortious-interference-with-contract claim and holding third party's mailing of defamatory memo interfered with plaintiff's business relationship).

█ But as to terminable-on-notice or terminable-at-will contracts, the protection *Juliette Fowler Homes* and *Sterner* provide is somewhat limited. The supreme court has also instructed that a party cannot be liable for inducing another party "to do what it had a right to do" under a contract. *ACS Investors, Inc. v. McLaughlin,* 943 S.W.2d 426, 431 (Tex. 1997). Thus, a third party is prohibited from tortiously interfering with a terminable-on-notice or terminable-at-will contract, but "merely inducing one of the parties to exercise his right to terminate contractual relations after giving the required notice does not *necessarily* constitute tortious interference with contract under Texas law." *Juliette Fowler Homes, Inc.,* 793 S.W.2d at 667. Likewise, "harm that results only from lawful competition is not compensable by the interference tort." *Sturges,* 52 S.W.3d at 727.

In this case, the jury was asked in separate questions whether Faucette and/or Schadler "intentionally interfered with the manufacturer's representative contracts [Sarco] had" with Elkay and Vanguard. The jury answered "yes" to both. But there was no evidence that either Elkay or Vanguard breached their contracts with Sarco. It was undisputed that Elkay and Vanguard gave thirty days' written notice of termination as their contracts provided, and Sarco did not allege or show that Faucette and/or Schadler induced them to breach their contracts with Sarco during the thirty-day termination period. Sarco's real complaint below and on appeal is the loss of the continuing business relationship with Elkay and Vanguard, two of its most profitable lines, which had existed for over twenty years.

This court has recognized that tortious interference with prospective contractual relations includes continuing business relations. *See Heil–Quaker Corp. v. Mischer Corp.*, 863 S.W.2d 210, 214 (Tex.App.-Houston [14th Dist.] 1993), *writ granted, judgm't vacated w.r.m.*, 877 S.W.2d 300 (Tex.1994). In *Heil–Quaker*, the appellants argued there was no evidence to support the jury finding of tortious interference with business relations because the tortious interference alleged was directed to an existing contract rather than a prospective contractual relationship. *Id.* at 214. The court rejected this contention, stating that tortious interference with business or prospective contractual relations concerns not only business relations that have not yet been reduced to a contract but also continuing business relations not amounting to a formal contract. *Id.* (citing RESTATEMENT OF TORTS (SECOND) § 766B, cmt. a, c (1979)).

More recently, in an appeal from a summary judgment, the Fort Worth court of appeals rejected a contention that a claim for tortious interference with pro-spective relations could not apply to a complaint that business was taken from an existing customer. *Astoria Indus. of Iowa, Inc. v. SNF, Inc.*, 223 S.W.3d 616, 633 (Tex.App.-Fort Worth 2007, pet. denied). Citing *Heil–Quaker Corp.*, the court concluded that tortious interference with prospective business relations includes tortious interference with continuing business relationships. *Id.* The court then proceeded to review the summary-judgment evidence concerning the defendant's alleged interference with the plaintiff's existing customer, including whether there was no evidence that the defendant engaged in independently tortious conduct. *See id.* at 633–37.

In the context of at-will or terminable-on-notice contracts, the Restatement provides further support for the conclusion that the loss of the contract due to another's tortious acts is properly considered tortious interference with prospective, or continuing, business relations:

> One's interest in a contract terminable at will is primarily an interest in future relations between the parties, and he has no legal assurance of them. *For this reason, an interference with this interest is closely analogous to interference with prospective contractual relations.* (See § 766B).

RESTATEMENT (SECOND) OF TORTS § 766 cmt. g (1979) (emphasis added). Likewise, section 766B, the section applicable to prospective contractual relations, includes "interferences with ... the opportunity of selling or buying land or chattels or services, and any other relations leading to potentially profitable contracts." *Id.* § 766B cmt. c. The comments to this section explain that "[i]n many respects, a contract terminable at will is closely analogous to the relationship covered by this Section." *Id.*

We conclude, therefore, that under the facts of this case, Sarco's claim is

properly characterized as one for tortious interference with prospective relations, rather than tortious interference with existing contracts. We further conclude that the jury questions, as written, were broad enough to encompass this theory.

 Because we have concluded that Sarco's claim is one for tortious interference with prospective contracts, Sarco was required to demonstrate that, among other things, Faucette and Schadler engaged in independently tortious or unlawful acts that interfered with its business relations with Elkay and Vanguard. *See Sturges,* 52 S.W.3d at 726.[7] But Sarco does not assert that Faucette and Schadler engaged in any independently tortious conduct.[8] In the absence of any evidence to support this element of the cause of action, we conclude the trial court did not err in granting the JNOV.

Sarco contends, however, that it is not required to demonstrate that a contract was breached to show actionable interference with contract relations. Instead, Sarco argues that a party may be liable for interference by actions that do not necessarily induce a breach of contract but which injure persons so that they are unable to perform a contract, destroy or damage property that is the subject matter of a contract, or make performance of a contract "more burdensome, difficult or impossible, or of less or no value to the one entitled to performance." *See Tippett v. Hart,* 497 S.W.2d 606, 610 (Tex.Civ.App.-Amarillo 1973), *writ ref'd n.r.e.,* 501 S.W.2d 874 (Tex.1973); RESTATEMENT (SECOND) OF TORTS § 766A. According to Sarco, Faucette and Schadler planned to resign without notice or warning, in a manner and at a time when they knew it would harm Sarco, and took Sarco's only other salesperson with them, leaving the company unable to continue its contracts with Elkay, Vanguard, and even its other lines, because it no longer had a sales force.

Sarco's argument fails, however, because it conflates distinct theories of tortious interference in a way that is inconsistent with the jury questions and the evidence. Sarco's authorities address the situation in which a plaintiff may recover for tortious interference with the plaintiff's performance of her own contracts, not tortious interference with the other party to the contract's performance. For example, in *Tippett v. Hart,* Hart sued Tippett for allowing his cattle to graze on her land without her permission, causing her to breach a contract she had with a governmental agency that prohibited grazing. *See* 497 S.W.2d at 607–11. Likewise, the Restatement (Second) of Torts section 766A, entitled "Intentional Interference with Another's Performance of His Own Contract," provides as follows:

---

7. We acknowledge that there are cases in which the elements of tortious interference with contracts was applied to the alleged loss of continuing business relationships. *See, e.g., SP Midtown, Ltd. v. Urban Storage, L.P.,* No. 14–07–00717–CV, 2008 WL 1991747, *8–9 (Tex.App.-Houston [14th Dist.] May 8, 2008, pet. denied) (mem. op.); *Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 218 (Tex. App.-Houston [14th Dist.] 2001, pet. denied). But these cases are distinguishable because the issue presented here was not addressed.

8. We note that an allegation that Faucette and Sarco breached a fiduciary duty could have supplied the independently tortious conduct to support this element. *See RenewData Corp. v. Strickler,* No. 03–05–00273–CV, 2006 WL 504998, at *10–12 (Tex.App.-Austin Mar. 3, 2006, no pet) (mem. op.) (holding former employee's breach of fiduciary duties to employer satisfies the *Sturges* prerequisites for a claim of tortious interference with prospective business relations). But Grace and Sarco did not plead, seek to demonstrate, or request a jury question concerning whether Faucette and Chantos breached any fiduciary duty to Sarco.

One who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

RESTATEMENT (SECOND) OF TORTS § 766A (1979). Section 766A "is concerned only with the actor's intentional interference with the plaintiff's performance of his own contract, either by preventing that performance or making it more expensive or burdensome." *Id.* cmt. a. Further, "[i]t is to be contrasted with [section] 766, which states the rule for the actor's intentional interference with a third person's performance of his existing contract with the plaintiff and section 766B, which concerns 'the actor's intentional interference with the plaintiff's prospective contract relations." *Id.*

Here, the jury was asked whether Faucette and Schadler tortiously interfered with Sarco's contracts with Elkay and Vanguard—not whether Faucette and Schadler tortuously interfered with Sarco's own performance of its contracts with Elkay and Vanguard. Even if we read the jury question broadly enough to encompass this theory, there is no evidence that Faucette and Schadler tortiously interfered by preventing Sarco from performing its contracts with Elkay and Vanguard. Elkay and Vanguard notified Sarco that they were exercising their contractual rights to terminate their contracts on thirty days' notice almost immediately after Faucette's and Schadler's resignations, and Sarco points to no evidence that Faucette's and Schadler's actions impaired or destroyed its ability to perform its contracts with Elkay and Vanguard during the remaining thirty days of each contract. As previously discussed, Sarco's real complaint concerning Elkay and Vanguard is the loss of these two profitable lines of business to Faucette and Schadler's new company, Tri–Rep. Further, to the extent Sarco points to evidence that it was unable to conduct business after Faucette and Schadler resigned, the jury was not asked whether Faucette and Schadler interfered with Sarco's ability to perform its own contractual obligations to its remaining lines.

Therefore, viewing the evidence in a light most favorable to the jury's verdict, we hold that the trial court did not err in granting Faucette and Schadler's motion for JNOV, and we overrule Sarco's issue.

\* \* \*

Having overruled the parties' issues on appeal and cross-appeal, we affirm the trial court's judgment.

(FROST, J. concurring and dissenting).

KEM THOMPSON FROST, Justice, concurring and dissenting.

To the extent this court affirms the trial court's judgment notwithstanding the verdict as to the tortious-interference-with-contract claims, I concur in the judgment. To the extent this court affirms the trial court's judgment awarding recovery on the breach-of-contract claims and declines to render a take-nothing judgment on these claims, I respectfully dissent.

Under the unambiguous language of the agreement in question, to exercise their option to acquire the remaining shares of the corporation, the option holders had to make the purchase by means of a lump-sum payment within a specified time from the execution date of the contract, and if this purchase did not occur within that time frame, the agreement and the option in it would terminate. It is undisputed that the option holders never purchased the remaining shares, and the plaintiffs judicially admitted that the contract upon which they base their breach-of-contract

claims terminated at the expiration of the time period specified in the contract. Because the option holders did not exercise their option in the manner required by the contract and because the contract terminated by its own terms, the trial court erred in granting summary judgment in the plaintiffs' favor as to liability on the breach-of-contract claims and in denying the defendants' motion for summary judgment as to these claims. Accordingly, the trial court's judgment should be reversed, and this court should render a take-nothing judgment.

### Relevant Background

Plaintiffs/appellees/cross-appellants Grace C. Chantos and A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas (hereinafter collectively, the "Chantos Parties")[1] sued defendants/appellants/cross-appellees H. Frank Faucette and J. Lawrence Schadler (hereinafter collectively, the "Option Holders") for breach of a written contract entitled "Sale and Purchase Agreement" (hereinafter, the "Contract"). Grace Chantos, Grace's husband Andrew J. Chantos, Faucette, and Faucette's wife executed the Contract on May 25, 2001. Schadler and his wife executed the Contract on July 24, 2001.

In a section of the Contract entitled "Sale and Purchase," the parties detailed the contemplated sale of the shares of A.J. Chantos & Associates, Inc., d/b/a Sarco of Texas (hereinafter, "Sarco") by Grace and her husband to the Option Holders and Andrew J. Chantos (collectively hereinafter, the "Buyers"). The parties agreed that during the first thirty months of the Contract or until the Buyers acquired forty-nine percent of the Sarco shares, whichever occurred first, the Option Holders were required to purchase at least four Sarco shares per month. Under the terms of the Contract, if the Buyers acquired at least forty-nine percent of the outstanding Sarco shares, then the Buyers had "the option to purchase the remaining shares, but only in a lump sum wherein Buyers purchase all remaining shares." The parties agreed that "[t]his Agreement *shall terminate unless* the Sale and Purchase contemplated is completed *in its entirety* within thirty-two (32) months from the date of execution of the Agreement" (hereinafter, the "Termination Provision"), (emphasis added). The parties did not specify a date of execution in the Contract. But in light of the two dates on which parties executed the Contract, this thirty-two month period ended no later than on March 24, 2004 (hereinafter, the "End Date").

It is undisputed that, by July 22, 2003, the Buyers had acquired forty-nine percent of the Sarco shares and that they had the option to purchase the remaining Sarco shares provided in the Contract (hereinafter, the "Option"). The Chantos Parties moved for partial summary judgment as to the Option Holders' liability on the breach-of-contract claims. In their sole ground for summary judgment, the Chantos Parties asserted that the summary-judgment evidence conclusively proves that (1) the Option Holders exercised the Option by giving oral notice to Grace at the July 22, 2003 meeting of their acceptance and intent to exercise the Option; and (2) the Option Holders breached the Contract by failing and refusing to purchase the remaining Sarco shares from Grace. The Chantos Parties agreed that acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the

---

1. Though Sarco was a plaintiff in the trial court, it was not a party to the Contract, and the trial court rendered judgment only in favor of Grace. References in this opinion to the "parties" pertain to the contracting parties, not to the parties to the litigation, and do not include Sarco.

terms of the agreement; but they asserted that the Contract did not contain any terms regarding the manner for exercising the Option. Therefore, the Chantos Parties argued, the Option Holders could accept and exercise the Option by giving oral notice to Grace at the July 22, 2003 meeting of their acceptance and intent to exercise the Option.

Both in response to the Chantos Parties' motion and as a ground for summary judgment in their own motion for final summary judgment, the Option Holders asserted that, under the Contract, the parties specified the manner in which the Option Holders had to exercise the Option—they had to purchase Grace's remaining shares in a lump-sum payment by the End Date. The summary-judgment evidence conclusively proves that the Option Holders did not purchase Grace's remaining shares by the End Date. Therefore, the Option Holders asserted, (1) the Contract terminated by its own terms; and (2) the Option Holders had no obligation to purchase the remaining shares under the Contract and did not breach any of its terms. The Option Holders attached to their motion for summary judgment responses to requests for admissions, in which the Chantos Parties judicially admitted that the Contract terminated within thirty-two months of the Contract's execution date and that the Contract was currently terminated.

The trial court denied the Option Holders' summary-judgment motion and granted the Chantos Parties' motion, ruling

that, as a matter of law, the Option Holders breached the Contract and are liable to Grace for the breach.

### Principles of Option Law

When one acquires an option to purchase property, the holder of the option purchases the right to compel a sale of the property on the stated terms before expiration of the option. *See Comeaux v. Suderman,* 93 S.W.3d 215, 219–20 (Tex.App.-Houston [14th Dist.] 2002, no pet.). Option contracts have two components: (1) an underlying contract that is not binding until accepted and (2) a covenant to hold open to the option holder the opportunity to accept. *See id.* at 220. Before the option can ripen into an enforceable contract of sale, however, the option holder must manifest his acceptance. *See id.* Acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement. *See id.* For this reason, a failure to exercise an option according to its terms, including untimely or defective acceptance, is simply ineffectual, and legally amounts to nothing more than a rejection. *See id.* If the contract is silent regarding the method of exercising the option, the option holder may exercise the option by timely giving notice to the optionor of the option holder's intent to exercise the option, and the option holder also may be required to tender performance within a reasonable time.[2] *See English v. English,* 44 S.W.3d 102, 105 (Tex.App.-Houston [14th Dist.] 2001, no pet.).

**2.** Various cases state that, if the contract is silent regarding the method of exercising the option, the option holder may exercise the option by timely giving notice to the optionor of the option holder's intent to exercise the option and by subsequently tendering performance within a reasonable time. *See, e.g., English v. English,* 44 S.W.3d 102, 105 (Tex. App.-Houston [14th Dist.] 2001, no pet.) (stating that "we conclude and hold that where the option instrument is silent regarding the

method of exercising the option, giving timely notice to the optionor and subsequently tendering performance within a reasonable time is sufficient to exercise the option"). But, given that the overwhelming majority of option cases involve option holders seeking to enforce the option, it may be that the tender of performance is required in these cases because the option holder seeks to enforce the option rather than as part of the exercise of

### Principles of Contract Interpretation

In construing contracts, this court's primary concern is to ascertain and give effect to the intentions of the parties as expressed in the contract. *Kelley–Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 464 (Tex.1998). To ascertain the parties' true intentions, this court must examine the entire agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be rendered meaningless. *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex.1999). Whether a contract is ambiguous is a question of law for the court. *Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996). A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Id.* But, when a written contract is worded so that it can be given a certain or definite legal meaning or interpretation, it is unambiguous, and the court construes it as a matter of law. *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). This court cannot rewrite the Contract or add to its language under the guise of interpretation. *See id.* at 162. Rather, this court must enforce the Contract as written. *See Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex.1965).

### Analysis of the Contract

In the Contract, the parties agreed that, if the Buyers acquired at least forty-nine percent of the outstanding Sarco shares,

the option. *See id.* (stating that "if [option holder] gave notice of her intent to exercise the option within the applicable 180 day period, such notice would be sufficient to trigger her rights under the divorce decree"). This court need not address this issue to dispose of this appeal, and it is not addressed in this opinion.

then the Buyers would have the option to purchase the remaining shares, but only through a lump-sum payment by which the Buyers would acquire all remaining shares. The parties also agreed that the entire Contract would terminate unless the contemplated purchase of the Sarco shares was completed in its entirety by the End Date. The parties did not agree that any provisions of the Contract would survive termination of the Contract. If the Option Holders could have exercised the Option simply by giving notice to Grace of their acceptance and intent to exercise the Option and without purchasing the remaining shares from Grace, such an exercise would have imposed a binding obligation on the Option Holders to purchase the remaining shares by a lump-sum payment. But this construction of the Contract would render the Termination Provision meaningless. *See Kruegel v. Berry*, 75 Tex. 230, 9 S.W. 863, 863–64 (1888) (stating that option holder under lease had to tender purchase price before lease terminated in order to exercise option to buy leased premises for a specified price); *Nguyen v. Woodley*, 273 S.W.3d 891, 898 (Tex.App.-Houston [14th Dist.] 2008, no pet.) (holding that contract for purchase of real property terminated by its own terms upon buyer's giving of a certain notice and that therefore the contract was no longer valid and enforceable); *Cate v. Woods*, 299 S.W.3d 149, 153 (Tex. App.-Texarkana 2009, no pet.) (holding that trial court erred as a matter of law by enforcing contract for purchase of real property that had terminated by its own terms).[3]

---

3. The Chantos Parties rely upon the *English* case. *See English*, 44 S.W.3d at 103–5. But, in that case, the divorce decree in question contained language materially different from the language in the Contract. *See id.* The divorce decree did not contain language similar to the Termination Provision, and the decree was silent as to the manner in which the option should be exercised. *See id.* Therefore, the English case is not on point.

If the Termination Provision is given effect, then the Option Holders could not be bound to purchase the remaining shares because they could wait until the End Date passed and any obligation to purchase the remaining shares would terminate. Harmonizing and giving effect to all provisions of the contract so that none will be rendered meaningless, this court should conclude that, under the unambiguous language of the Contract, the parties specified the manner in which the Option Holders had to exercise the Option—they had to purchase the remaining shares by the End Date. *See MCI Telecomms. Corp.*, 995 S.W.2d at 652. The summary-judgment evidence proves as a matter of law that the Option Holders did not do so, and therefore, they did not exercise the Option. After the End Date passed, the Contract terminated without any exercise of the Option. Indeed, the Chantos Parties have judicially admitted that the Contract upon which the trial court's judgment is based. terminated on or before the End Date, which was before the Chantos Parties filed this lawsuit in the trial court.

In their Contract, the parties required the Option Holders to purchase Sarco stock up to the forty-nine-percent threshold. The parties could have required the Option Holders to purchase the remaining stock; however, the parties chose not to do so. Instead, they agreed to contractual language under which the Option Holders had the ability to choose whether they wanted to exercise the Option by purchasing the remaining shares from Grace no later than the End Date. This court cannot rewrite the Contract or add to its language under the guise of interpretation; instead, the court must enforce the Contract as written. *See Schaefer,* 124 S.W.3d at 157; *Marshall,* 388 S.W.2d at 181.

### Conclusion

The sole ground asserted in the Chantos Parties' motion for summary judgment lacks merit.[4] In their cross-motion, the Option Holders proved as a matter of law that they did not exercise the Option and that the Contract terminated by its own terms.[5] Though the majority notes the Option Holders' arguments in this regard, the majority does not address these arguments or explain why they lack merit. The court should address these arguments, sustain the Option Holders' first issue, and hold that the trial court erred by failing to grant the Option Holders' motion.[6] Accordingly, this court should reverse the trial court's judgment and render judgment that the Chantos Parties take nothing.

---

4. On appeal, the Chantos Parties assert, in the alternative, that this court should affirm the trial court's judgment on the breach-of-contract claims based on an alleged modification of the Contract by the parties at the July 22, 2003 meeting. Significantly, however, the Chantos Parties did not assert any alleged modification of the Contract as a ground in their summary-judgment motion. Therefore, this court cannot affirm the trial court's summary judgment on this unasserted ground. *See Stiles v. Resolution Trust Corp.*, 867 S.W.2d 24, 26 (Tex.1993)

5. Presuming for the sake of argument that the Option Holders could have exercised the Option by notice alone and that they did so, the Chantos Parties still could not prevail on a breach-of-contract claim because the Contract terminated on the End Date and the parties did not agree that any contractual obligations would survive termination. *See Nguyen,* 273 S.W.3d at 898; *Cate,* 299 S.W.3d at 153.

6. This court appropriately holds the trial court did not err in granting the Option Holders' motion for judgment notwithstanding the verdict as to the tortious-interference-with-contract claims.