**LEXINGTON INSURANCE COMPANY, Appellant,**

v.

**NATIONAL OILWELL NOV, INC. and Fiberglass Systems, L.P., Appellees.**

No. 01–10–00711–CV.

Court of Appeals of Texas, Houston (1st Dist.).

May 12, 2011.

Jessica A. Zavadil, Thomas C. Wright, Wright Brown & Close, L.L.P., Houston, TX, for Appellant.

James M. Bettis Jr., Paul D. Sculey, Harrison, Bettis, Staff, McFarland & Weems, LLP, Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

JANE BLAND, Justice.

Albemarle Corporation (Albemarle) sued National Oilwell NOV, Inc. (National) in federal district court in Arkansas. It sought damages allegedly caused by defective fiberglass downhole tubing (DHT) that National had manufactured and sold it. National timely notified its insurer, Lexington, of the lawsuit, and Lexington acknowledged a responsibility to defend under a reservation of rights once National exhausted its self-insured retention.

After the case settled, Lexington brought this suit in Texas state district court, seeking a declaration of the rights and duties of the parties under the policy with respect to the Albemarle suit. After considering the parties' cross-motions for summary judgment, the trial court granted relief in National's favor, holding that Lexington had a duty to defend National in the Albemarle suit, accordingly awarding National its defense costs as damages and attorney's fees.

On appeal, Lexington contends that the trial court should have granted its motion for summary judgment because the allegations of damages sought in the Albemarle suit are excluded by the terms of the Lexington policy. Thus, it contends, the Albemarle allegations did not trigger a duty to defend under the policy. Lexington alternatively contends that it owed no duty to pay the defense costs National incurred after it exhausted the limits of the self-insured retention clause because National failed to timely notify Lexington it exhausted its SIR. National further challenges the propriety of the trial court's corresponding summary judgment on National's counterclaims for breach of contract and violation of the Texas Insurance Code's prompt payment statute. TEX. INS. CODE ANN. §§ 542.051–.061 (West 2009). Finding no error, we affirm.

## Background

### I. The insurance policy

Lexington issued a commercial general liability policy to the insureds for the policy period from May 11, 1999 to May 11, 2002. Pertinent to this case, the policy contains an endorsement for products liability claims that provides:

> ... Underwriters will indemnify the Assured in respect of damages arising out of the Products Liability hazard, whether imposed by law or assumed under contract in respect of any claim which is first made in writing against the Assured during [the policy period] and which arises solely by reason of

> ...

> (b) Property Damage

> resulting from any Accident....

"Products Liability" shall mean:

> Liability for ... Property Damage arising out of the Assured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the ... Property Damage happens after physical possession of such products has been relinquished to others and happens away from the premises owned, leased or rented by the Assured.

"Property Damage" shall mean:

> physical loss of or damage to or destruction of tangible property, including the loss of use arising directly therefrom.

The policy, however, excludes coverage for:

- Property Damage to the Assured's Products arising out of such products or any part of such products [or]
- The withdrawal, recall, repair, replacement or loss of use of the Assured's products or work completed by or for the Assured.

The policy contains a self-insured retention of $100,000 for each occurrence.

## II. The underlying suit

### A. Albemarle's allegations

According to Albemarle's pleadings in the Arkansas suit, its business entails extraction of bromide ions from brine recovered from subsurface deposits. Albemarle uses pipes to transport the brine to its manufacturing facilities for the extraction. After processing the brine, Albemarle transports the heated "tail brine" through more pipes to underground storage wells and eventually back to subsurface reservoirs.

Beginning in 1994, National's predecessor, A.O. Smith, sold fiberglass downhole tubing, or pipe, to Albemarle. Albemarle replaced its existing metal pipe with the fiberglass DHT. It used the DHT to transport the brine to its manufacturing facilities in Columbia City, Arkansas. Finding that the fiberglass pipe was more durable than the metal pipe, Albemarle asked Smith to manufacture a DHT product for use in its disposal wells. Smith recommended a pipe made with aromatic amine epoxy, one that it already had manufactured for use in transporting natural and manufactured gas, petroleum fuels, and mixed gases.

Albemarle installed the aromatic amine epoxy pipe in April 1995. Eventually, however, the pipe split, separated, and leaked. These failures left Albemarle unable to continue operations in several of its disposal wells. By November 1995, Smith informed Albemarle that its testing revealed that the pipe had an inadequate tensile strength for transporting the hot tail brine.

With respect to damages, Albemarle first alleged that it was entitled to recover repair and replacement costs of the pipe and lost income because it was forced to forego business opportunities while operating without several of its disposal wells. Second, Albemarle alleged that its injection wells were forced to stop operations "while being repaired." The entire damages section reads:

Albemarle has suffered damages including, but not limited to, the following:

(a) Albemarle has spent or reasonably anticipates spending more than $2,900,600 to repair or replace the defective DHT;

(b) Albemarle lost income and profits due to the fact that the injection wells containing the defective DHT were forced to stop operations while being repaired;

(c) Albemarle lost business opportunities due to the fact that the injection wells containing the defective DHT were forced to stop operations while being repaired;

(d) Albemarle suffered other incidental and consequential damages due to the defective condition of the DHT; and

(2) Albemarle has incurred attorneys' fees and expenses in having to bring this cause of action.

To represent it in the Albemarle suit, National retained Texas defense counsel expressly identified in the Lexington policy as "approved counsel that may be used by the Assured without seeking prior approval from Underwriters in the event of a Loss under this policy." National also retained local counsel in Arkansas to assist in its defense.

## B. Notice and claims handling

Through its insurance broker, National notified Lexington of the Albemarle suit in April 2005. Defense counsel provided Lexington with a December 2005 status report. Lexington responded by sending National a reservation of rights letter four months later, in April 2006. In the letter, Lexington concluded that Albemarle's claims fell within the policy's products liability endorsement, creating "a potential indemnity obligation for Lexington with regard to the allegations...." Then, Lexington proceeded to examine whether any of the policy exclusions barred coverage. Lexington noted that "the cost of repair and/or replacement of the DHT which failed in the wells is a significant element of Albemarle's claimed damages," but conceded that:

> it is unclear from Albemarle's Complaint the exact nature and extent of all the damages claimed by Albemarle as a result of the failure of the DHT. Certain of the damages claimed by Albemarle, such as lost profits, lost business opportunities, consequential losses associated with the replacement of the DHT could conceivably not be precluded from coverage by virtue of the exclusions cited above...."

While reserving its rights, Lexington acknowledged that it "may have a contractual duty to indemnify [National] in this matter but only after the SIR of $100,000 has been paid by [National] in defense and/or settlement or judgment of Albemarle's claims." Lexington reiterated its agreement to National's selection of defense counsel for the suit and continued, "[a]t such time as it appears likely that the SIR will be fully eroded, Lexington requests that [National] so notify Lexington so that Lexington may then begin to provide a defense to [National] for the claims in the complaint, and to take reasonable steps in this matter necessary to protect [National's] interests, as well as Lexington's own."

National incurred $703,179.27 in attorney's fees and expenses—well in excess of the SIR—before settling the Albemarle case. Lexington declined to reimburse National for the balance exceeding the SIR and brought a declaratory judgment action against National in May 2006. Lexington asked the trial court to declare that it had no duty to defend National under the policy, and alternatively, that National's failure to provide timely notice that it exhausted the SIR relieved Lexington from any obligation to pay the attorney's fees and expenses. National counterclaimed for breach of contract and violation of the Texas Insurance Code's prompt payment provision. TEX. INS.CODE ANN. § 542.051. The trial court considered the parties' cross-motions for summary judgment and granted summary judgment in favor of National.

## Discussion

### I. Standard of review

We review a trial court's summary judgment de novo. *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005); *Provident Life Accid. Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). Under the traditional standard for summary judgment, the movant has the burden to show that no genuine issue of material fact exists and that the trial court should grant a judgment as a matter of law. TEX.R. CIV. P. 166a(c); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.,* 988 S.W.2d 746, 748 (Tex.1999). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant and indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Dorsett,* 164 S.W.3d at 661; *Knott,* 128

S.W.3d at 215; *Sci. Spectrum, Inc. v. Martinez,* 941 S.W.2d 910, 911 (Tex.1997).

Traditional summary judgment is proper only if the movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). The motion must state the specific grounds relied upon for summary judgment. *Id.* A defendant moving for traditional summary judgment must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc.,* 941 S.W.2d at 911. "When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered." *Mid–Continent Cas. Co. v. Global Enercom Mgmt., Inc.,* 323 S.W.3d 151, 153–54 (Tex.2010) (citing *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.,* 136 S.W.3d 643, 648 (Tex.2004)).

## II. Insurance Policy Interpretation

Lexington contends that it owed National no defense because Albemarle's claims against National do not fall within the policy's insuring clause and are excluded by the policy language. The plain language of an insurance policy, like that of any other contract, must be given effect when the parties' intent may be discerned from it. *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.,* 141 S.W.3d 198, 202 (Tex. 2004). If the policy language has only one reasonable interpretation, then it is not ambiguous, and we construe it as a matter of law. *Fiess v. State Farm Lloyds,* 202 S.W.3d 744, 746 (Tex.2006); *Am. Mfrs. Mut. Ins. Co. v. Schaefer,* 124 S.W.3d 154,

157 (Tex.2003). If the contract is susceptible to two or more reasonable interpretations, then it is ambiguous and we must resolve the uncertainty by adopting a construction that favors the insured as long as that construction is not unreasonable. *Fiess,* 202 S.W.3d at 746 (citing *Nat'l Union Fire Ins. Co. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991)). "When interpreting an insurance contract, we 'must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent.'" *Evanston Ins. Co. v. ATOFINA Petrochems., Inc.,* 256 S.W.3d 660, 668 & n. 25 (Tex.2008) (quoting *Nat'l Union Fire Ins. Co.,* 811 S.W.2d at 555). "'Exceptions or limitations on liability are strictly construed against the insurer and in favor of the insured,' and '[a]n intent to exclude coverage must be expressed in clear and unambiguous language.'" *Id.* (quoting *Nat'l Union Fire Ins. Co.,* 811 S.W.2d at 555).

### A. Duty to defend

In contrast to the duty to indemnify, which arises only if the facts actually established in the underlying suit amount to a covered claim, the duty to defend arises if a plaintiff's factual allegations, read together with the insurance policy at issue, potentially support a covered claim. *GuideOne Elite Ins. Co. v. Fielder Rd. Baptist Church,* 197 S.W.3d 305, 310 (Tex. 2006); *see also Burlington N. & Santa Fe Ry. v. Nat'l Union Fire Ins. Co.,* 334 S.W.3d 217, 219 (Tex.2011). Under this eight corners rule, the allegations in the pleadings and the language of the insurance policy determine an insurer's duty to defend. *Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines, Inc.,* 939 S.W.2d 139, 141 (Tex.1997). "Where the

complaint does not state facts sufficient to clearly bring the case within or without the coverage, the general rule is that the insurer is obligated to defend if there is, potentially, a case under the complaint within the coverage of the policy." *Heyden Newport Chem. Corp. v. S. Gen. Ins. Co.*, 387 S.W.2d 22, 26 (Tex.1965) (internal quotation omitted), *quoted in Zurich American Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex.2008); *King v. Dallas Fire Ins. Co.*, 85 S.W.3d 185, 187 (Tex. 2002) (instructing that courts resolve all doubts regarding duty to defend in favor of duty); *see also Gore Design Completions, Ltd. v. Hartford Fire Ins. Co.*, 538 F.3d 365, 368 (5th Cir.2008) (noting that "[t]he rule is very favorable to insureds because doubts are resolved in the insured's favor").

▮▮▮▮ The duty to defend is not affected by facts ascertained before suit, developed during litigation, or by the ultimate outcome of the suit. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 829 (Tex.1997). "Even if the allegations are groundless, false, or fraudulent, the insurer is obligated to defend." *Zurich Am.*, 268 S.W.3d at 491. Further, "[i]f a complaint potentially includes a covered claim, the insurer must defend the entire suit." *Id.* An insurer must defend its insured against suit as long as the allegations potentially give rise to at least one claim covered by the insurance policy, regardless of the number of claims potentially not covered. *See Utica Nat'l Ins. Co. v. Am. Indem. Co.*, 141 S.W.3d 198, 201–02 (Tex. 2004) ("A liability insurer is obligated to defend a suit if the facts alleged in the pleadings would give rise to any claim within the coverage of the policy."). Thus, an insurer may have a duty to defend but, eventually, no obligation to indemnify. *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 82 (Tex.1997).

In general, we do not consider matters outside the policy and the pleadings in determining whether the allegations support a duty to defend. *Capital Bank v. Commonwealth Land Title Ins. Co.*, 861 S.W.2d 84, 88 (Tex.App.-Houston [1st Dist.] 1993, no writ). We will not read facts into the pleadings, nor will we "imagine factual scenarios which might trigger coverage." *Merchs. Fast Motor Lines*, 939 S.W.2d at 142. We therefore examine whether the allegations in Albemarle's petition together with the CGL policy language impose a duty on Lexington to defend National in the Albemarle lawsuit because the suit may potentially encompass a covered claim.

### 1. Coverage under the insuring clause

Lexington contends that the products liability insuring clause does not cover Albemarle's claims because, according to Lexington, "all of [Albemarle's] allegations and damages arose from or flowed from its need to repair or replace [National's] damaged product—the defective DHT." Lexington cites *Building Specialties, Inc. v. Liberty Mutual Fire Insurance Co.*, 712 F.Supp.2d 628 (S.D.Tex.2010), for the proposition that allegations of a defective product are not allegations of "property damage," and thus do not give rise to the duty to defend. In that case, the district court considered that the petition alleged defective work by the insured but did not allege that the defective work "caused physical injury or loss of use." *Id.* at 645.

▮▮▮ We agree with the legal principle, but do not read the Albemarle complaint as Lexington suggests. Albemarle alleged damages in addition to repair and replacement costs—namely, "other incidental and consequential damages due to the defective condition of the DHT," and that its injection wells were forced to stop operation "while being repaired," not, as Lexing-

ton would read it, "while [the DHT] was being repaired." Contrary to Lexington's interpretation, we do not read these additional allegations as merely reiterating the plea for repair and replacement of the DHT.

Lexington attacks Albemarle's plea for "incidental and consequential damages" as conclusory and not the kind of factual allegation that can trigger a duty to defend. In its support, Lexington cites *Clemons v. State Farm Fire & Casualty Co.,* in which our sister court held that the plaintiff's prayer for relief for "other and further relief to which plaintiffs may be justly entitled" was not a factual allegation of the insureds' "potential liability for 'injury to or destruction of property, including the loss of use thereof' within the meaning of the property damage provision of the insurance policies." 879 S.W.2d 385, 392 (Tex.App.-Houston [14th Dist.] 1994, no pet.). The court rightly observed that a holding to the contrary would mean that every petition "seeking 'other and further relief' would precipitate a duty to defend." *Id.* at 393.

That danger is not present here because Albemarle's request for "incidental and consequential damages" is more than a catch-all. The pleadings indicate that the DHT is only one component of Albemarle's manufacturing facilities. In the phase of its manufacturing process relevant to this case, Albemarle's pleadings explain that, after removing the bromide ions from the brine, "[t]he remaining 'tail brine' is then transported through surface piping to 'disposal' or 'injection' wells, through which the tail brine is returned to subsurface reservoirs." In recounting the events giving rise to its claim against National, Albemarle alleged that it "conducted an investigation and found that the DHT was failing by splitting, separating, or leaking in various disposal wells. These failures made it impossible for Albemarle to continue its operations in several of its disposal wells."

Lexington contends that these allegations mean only that Albemarle had to stop its operations so that it could repair and replace the DHT, and that the other parts of the piping and wells were unaffected. We agree that this is a reasonable interpretation, but it is not the only one. Another possible interpretation is that the failure of the DHT caused damage to the wells themselves, as they suffered and were out of commission "while being repaired." This alternate construction, together with an express claim for incidental and consequential damages, supports a duty to defend.[1]

Unlike the pleadings *in Clemons* and *Building Specialties,* the pleadings here reasonably can be read to allege a causal connection between the failure of the pipe and damage to the injection or disposal wells. "Where an ambiguity involves an exclusionary provision of an insurance policy, we must adopt the construction urged

---

1. For this reason, Lexington's reliance on *National Union Fire Insurance. Co. v. Merchants Fast Motor Lines,* 939 S.W.2d 139 (Tex.1997), is misplaced. In *National Union,* the policy issued to Merchants covered "damages because of bodily injury or property damage ... caused by an accident and resulting from the ownership, maintenance or use of a covered auto." *Id.* at 141. The plaintiff's pleadings in the underlying case alleged that one of Merchants's employees was operating a company truck when he "negligently discharged a firearm and caused a bullet to strike" and mortally injure a passenger in a nearby vehicle. *Id.* According to the supreme court those allegations "do not suggest even a remote causal relationship between the truck's operation and [the passenger's] injury and do not create that degree of doubt which compels resolution of the issue for the insured." *Id.* at 141–42. The court thus held that the pleadings did not give rise to a duty to defend. *Id.* at 142.

by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Balandran v. Safeco Ins. Co. of Am.,* 972 S.W.2d 738, 741 (Tex.1988) (internal quotation omitted), *quoted in Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London,* 327 S.W.3d 118, 133 (Tex.2010). Construing the pleadings favorably to the insured, we hold that Albemarle's plea for "other incidental and consequential damages" encompasses alleged property damage beyond repair of the product itself, thus asserting a claim potentially covered under the products liability insuring clause of the policy.

### 2. Effect of policy exclusions

■ According to Lexington, Albemarle's claimed damages are excluded under the policy under two clauses. Under the first, the products liability insuring clause does not apply to "Property Damage to the Assured's Products arising out of such products or any part of such products." The second clause invoked by Lexington excludes coverage for "[t]he withdrawal, recall, return, repair, or replacement, or loss of use of the Assured's products or work completed by the Assured." Lexington points to Albemarle's

detailed allegations relating to the repair and replacement damages resulting from the defective DHT and dismisses as meaningless boilerplate the phrase "other incidental and consequential damages," contending that it is not enough that "this phrase *could* refer to damage caused by their products to property other than the defective products themselves and that, as a result, such *might* [ ] fall within an exception to the policy's exclusions of product liability coverage." This contention misapprehends the eight corners rule. *See Zurich Am.,* 268 S.W.3d at 491, 495–96 (observing that duty to defend is triggered by inclusion of claims that *might* be covered and that generally, insurer is obligated to defend if case *potentially* falls within coverage of policy). That "other incidental and consequential damages" is a vague, possibly ambiguous factual allegation, does not render it meaningless for purposes of determining whether Lexington has a duty to defend National in the Albemarle suit, given the entirety of the pleading.[2] *See, e.g., Zurich Am.,* 268 S.W.3d at 492–93 (construing allegations of "biological injury" or "biological effects" and unspecified compensatory damage claims—referred to in pleadings as "including, but not limited to" and "consisting, among other things"

---

2. In urging the application of the exclusion clauses, Lexington points to *Valmont Energy Steel, Inc. v. Commercial Union Insurance Co.,* 359 F.3d 770 (5th Cir.2004), and *National Union Fire Insurance Co. v. Puget Plastics Corp.,* 450 F.Supp.2d 682 (S.D.Tex.2006). In *Valmont Energy,* the Fifth Circuit held that the insurer did not owe indemnification where a similar "your product" exclusion barred coverage for property damage to steel flanges the insured sold to a third party arising from the insured's representations made with respect to the quality of its product. 359 F.3d at 776. In *Puget Plastics,* the federal district court, under Texas law, held that the insurer did not owe indemnification where the "your product" exclusion precluded cov-

erage for costs to repair and replace the insured's own product, a component part used in tankless water heaters. 450 F.Supp.2d at 696–97. Both of those cases involve an insurer's duty to indemnify, and thus apply a very different, more stringent analysis than the one we apply to determine whether the pleadings trigger a duty to defend. In any event, Albemarle's pleadings allege the type of situation in which the *Puget Plastics* court would find coverage—that is, where the defective component caused damage to "the water heaters or the homes and businesses in which the heaters were installed," for instance, if the component leaked and caused water damage. *See id.* at 704.

as covered "damages because of bodily injury" for purposes of duty to defend); *see generally Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983) ("Courts must favor an interpretation that affords some consequence to each part of the instrument so that none of the provisions will be rendered meaningless."). Albemarle's pleadings show that its manufacturing process involves more than pipe, and its reference to "other incidental and consequential damages" is reasonably construed as referring to damages beyond those requiring repair and replacement of the DHT itself. Resolving any uncertainty in favor of National, the insured, we hold that the cited exclusions do not apply to Albemarle's damages allegations. *See, e.g., Travelers Ins. Co. v. Volentine*, 578 S.W.2d 501, 503–04 (Tex.Civ.App.-Texarkana 1979, no writ) (holding that third party pleading alleged possibly covered claims where insured's work or work product was repair of automotive valves only; other parts of automobile engine would constitute "other property" under rule for interpreting exclusion, and thus policy affords coverage to extent other parts were damaged or destroyed); *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 882–83 (5th Cir.2009) (interpreting similar policy language and finding no exclusion where defective workmanship caused damage to property other than insured's own product); *Wilshire Ins. Co. v. RJT Constr., LLC*, 581 F.3d 222, 227 (5th Cir.2009) (holding that exclusion precluded coverage claims for repair and replacement of faulty foundation but not for allegations of damage to parts of house resulting from allegedly faulty foundation, so that insurer was required to defend entire suit); *Fed. Mut. Ins. Co. v. Grapevine Excavation, Inc.*, 197 F.3d 720, 722, 728 (5th Cir.1999) (holding that allegations of improper subsurface backfilling resulting in damage to parking lot trig-

gered duty to defend and did not fall within impaired property exclusion because replacing the backfill would not, in itself, fix damage to lot's surface), *modified on other grounds*, 241 F.3d 396 (5th Cir.2001).

### III. Notice of Exhaustion of Self–Insured Retention

■ Lexington further complains that National is not entitled to recover its costs because it failed to notify Lexington as soon as it had exhausted the SIR. Lexington relies on a sentence in its April 2006 reservation of rights letter to National in which it requested that National provide notice "[a]t such time as it appears likely that the SIR will be fully eroded." Lexington does not dispute that National complied with the policy's requirement that it "report any occurrence, claim or suit which may serve to deplete the self insured retention by 50% or more," but contends that either this request imposed on National an additional requirement to notify when the SIR was exhausted. We reject this contention. A unilateral request in a reservation of rights letter cannot create duties beyond those set forth in the policy. *Tex. Ass'n of Cnties. Risk Mgmt. Pool v. Matagorda Cnty.*, 52 S.W.3d 128, 131–32 (Tex.2000). Moreover, the policy's merger clause bars the possibility of any extracontractual duties relating to Lexington's reporting of the Albemarle claims and their status. National complied with the notice provisions of the policy. We hold that the trial court properly refused to recognize the additional duty urged by Lexington.

### IV. Summary Judgment on National's Counterclaims

■ Finally, Lexington challenges the trial court's grant of summary judgment on National's claims for breach of contract and violation of the Texas Insurance Code.

First, it contends that there was no duty to defend. Our holding that the policy provides coverage for the defense of the Albemarle suit leads to the conclusion that these challenges lack merit. Second, Lexington contends that the trial court erred in rejecting its claim that National, as a self-insurer, had an obligation to contribute to its own defense and, consequently, the fees should have been apportioned. Lexington relies on the policy section providing that: "When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess, or contingent, the Underwriters shall not be liable on [this policy] for a greater proportion of the loss than stated in the applicable contribution provision...." This policy language does not support Lexington's interpretation. Texas law is well-settled that a self-insured retention is not "other insurance" within the meaning of an "other insurance" clause. *See Hertz Corp. v. Robineau,* 6 S.W.3d 332, 335 (Tex.App.-Austin 1999, no pet.); *Home Indem. Co. v. Humble Oil & Ref. Co.,* 314 S.W.2d 861, 863 (Tex.Civ.App.-Dallas), *writ ref'd n.r.e. per curiam,* 159 Tex. 224, 317 S.W.2d 515 (1958) (endorsing court of appeals' holding that self-insurance was not "valid and collectible insurance" under policy); *accord Travelers Lloyds Ins. Co. v. Pac. Emp'rs Ins. Co.,* 602 F.3d 677, 684–85 (5th Cir. 2010) (applying Texas law). Lexington thus had a duty to pay all of National's reasonable defense costs, and its failure to make prompt payment of the defense costs in excess of the SIR supports the trial court's summary judgment on these claims.

## Conclusion

We hold that the trial court properly granted summary judgment on the basis that Lexington had a duty to defend National in the Albemarle suit and was liable for National's attorney's fees and expenses in excess of the self-insured retention. We therefore affirm the judgment of the trial court.