**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 14, 2013

No. 12-20746

Lyle W. Cayce
Clerk

THE CITY OF COLLEGE STATION, TEXAS,

Plaintiff - Appellant

v.

STAR INSURANCE COMPANY,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, CLEMENT, and PRADO, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Star Insurance Company ("SIC") refused to defend or indemnify its insured, the City of College Station ("the City"), in a lawsuit brought by Weingarten Realty Investors ("WRI"), a real-estate investment trust not party to this appeal. The City settled the underlying litigation with WRI and sued SIC to recover defense costs, indemnification, and statutory penalty interest. Applying Texas law, the district court concluded that SIC had no duty to defend or indemnify the City in the litigation with WRI and, consequently, no penalty liability for late payment. We reverse and remand for further proceedings.

No. 12-20746

## I.

In 2008, WRI sued the City in federal district court. WRI's suit arose out of a dispute over the re-zoning of a tract of land that WRI hoped to develop into a shopping mall centered around a Walmart store. As alleged in WRI's second amended complaint, WRI purchased the tract in reliance on the City's 1990 Comprehensive Plan, which designated the tract for "regional retail use," as well as the City's 2001 land use study, which designated the tract for a "power" retail center. According to WRI, the "regional retail use" designation in the Comprehensive Plan was legally binding on the City and meant that it could only zone the property as "General Commercial (C-1)" — the designation WRI needed to develop its mall. However, when WRI requested C-1 zoning in 2006 — a request that "should have been a mere formality" — the City denied it.

WRI nevertheless continued to work with the City "in an effort to salvage its investment." WRI met with a member of the City council, who advised WRI that it might get approval by replacing Walmart with HEB and by breaking its zoning request into several smaller applications so as to arouse less opposition from neighboring landowners. WRI followed these instructions, negotiating an agreement with HEB to be the new anchor tenant and submitting a revised zoning request for only 16 acres of its 76-acre tract. However, the City "tabled" the request, purportedly to conduct a transportation study. Though the study concluded in November 2007, the City did not take any action for another year and a half, until WRI sued the City in 2008. Finally, in 2009, the City introduced a new Comprehensive Plan that re-designated portions of WRI's property as "suburban commercial" and "general suburban" — designations that, according to WRI, will make it more difficult to develop the property.

WRI asserted four distinct causes of action against the City. First, WRI claimed that the City's actions were discriminatory and lacked a rational basis, violating its Fourteenth Amendment right to equal protection and entitling it to

2

damages and injunctive and declaratory relief.  WRI supported its equal protection claim with detailed factual allegations:

> [The City's] denials of WRI's zoning requests were unreasonable and constitute treatment different than that given by [the City] to individuals and entities situated similarly to WRI.  One such example is the development directly across the street from [WRI's] [p]roperty.  This development is similar to the development planned by WRI in that both are retail developments. [The City] approved the zoning for that development but not for WRI.  Generally speaking, upon information and belief, many individuals and entities have come before [the City] and requested zoning that is in accordance with the Comprehensive Plan, and [the City] has granted such zoning requests.  Here, [the City] denied WRI's requests despite the fact that they comply with the Comprehensive Plan. [The City] has also passed a [n]ew Comprehensive Plan . . . directed at blocking WRI's development in the future, while at the same time granting zoning to property owners who are developing their properties with the same tenants previously interested in WRI's [p]roperty at the intersection just south of [WRI's] [p]roperty.

According to WRI, the real reason for this disparate treatment was the City's irrational bias against WRI, Walmart, and "big box" retail.

Second, WRI  alleged, the City's repeated denials of its requests for re-zoning were "arbitrary and capricious," violating its Fourteenth Amendment right to substantive due process and entitling it to money damages and injunctive relief.  WRI urged that it had "requested the only type of zoning that can possibly be applied to the Property."  Nevertheless, the City repeatedly denied WRI's requests, purportedly because of concerns about "traffic and timing."  WRI claimed that these concerns were mere pretext, as they could "all have been mitigated at the permit stage before any permit for development was issued." Ultimately, the City council members denied WRI's requests "because of their dislike for Walmart, [and] their own personal or political interests." According to WRI, "none of these reasons for the denial were [sic] legitimate."

Third, WRI claimed that the City's "intentional actions in denying WRI's zoning requests constitute a taking under Article I, Section 17 of the Texas Constitution." WRI reasoned that in light of the City's 1990 Comprehensive Plan as well as its 2001 land use study, WRI "had reasonable expectations that it could develop the [p]roperty for retail use." Hence, WRI reasoned, the "denial of WRI's zoning proposals . . . had a significant negative impact on WRI's investment-backed expectations and have [sic] resulted in a taking without compensation to WRI." Moreover, WRI urged, the City's new Comprehensive Plan, adopted in 2009, was "designed to ensure that WRI cannot develop its [p]roperty in the future."

Fourth, WRI claimed that the City's individual council members had "intentionally interfered with WRI's existing and prospective contracts and business relationships for its development," entitling WRI to compensatory and punitive damages. According to WRI, it "lost some of [its prospective] tenants to new developments nearby that [the City's council members] approved." Moreover, WRI alleged, the council members "may have interests in these other developments or improper contacts with the other developers that have motivated them to approve the other developments while denying the request[s] of WRI without a legitimate basis or reason."

The City requested that SIC fund its defense of WRI's lawsuit. However, SIC refused, claiming that the general commercial liability policy it had issued to the City did not provide coverage. The policy covered liability arising out of "wrongful act[s]" by city officials, including errors, misstatements, misleading statements, neglect, breach of duty, misfeasance, malfeasance, and nonfeasance. However, the policy excluded "any liability . . . actually or allegedly arising out of or caused or contributed to by or in any way connected with any principle of eminent domain, condemnation proceeding, [or] inverse condemnation . . . by

whatever name called." According to SIC, WRI's lawsuit fell within the inverse-condemnation exclusion.

After settling WRI's lawsuit, the City sued SIC under the policy to recover defense costs, indemnity, and statutory penalty interest. SIC moved for summary judgment, urging that the allegations in WRI's second amended complaint conclusively negated the possibility of coverage under the policy and that it therefore had no duty to defend or indemnify the City. The district court agreed that SIC was not liable for the City's defense costs, reasoning that:

> WRI's allegations raised a taking/inverse condemnation claim in the underlying lawsuit. . . . Although . . . WRI labeled its other claims as violation of substantive due process, equal protection . . . and . . . tortious interference with WRI's contracts, the core or nucleus of the underlying dispute between WRI and the City is the City's refusal to grant WRI's zoning requests. In other words, these are derivative claims and do not constitute justiciable causes of action apart from WRI's inverse condemnation claim.

The court also agreed that SIC had no duty to indemnify the City for its settlement with WRI, reasoning that "given the broad and comprehensive nature of the exclusion provision, . . . there could be no facts in the settlement agreement that would alter the Court's conclusion that all of WRI's claims originate from its alleged inverse condemnation claim." The court therefore granted SIC's motion for summary judgment. The City appeals.

## II.

The first issue on appeal is whether SIC is liable for the City's defense costs. In determining whether an insurer's duty to defend is triggered, Texas courts strictly apply the "eight-corners rule," which looks only to the four corners of the most recent complaint in the underlying action as well as the four corners

of the insurance policy.[1]  If the underlying complaint pleads facts sufficient to create the *potential* of covered liability, the insurer has a duty to defend the *entire* case,[2] even if the allegations are demonstrably false, fraudulent, or groundless,[3] and even if some of the injuries alleged are not covered or fall within the scope of an exclusion.[4]  However, if the insurer can show that *all* of the alleged liability falls outside of the scope of coverage or within the scope of an exclusion, the insurer has no duty to defend.[5]  In other words, "[w]hile the duty to defend is triggered by a single alleged injury that falls within the scope of the coverage provision, exclusions negate the insure[r]'s duty to defend only when all of the alleged injuries that fall into the coverage provision are subsumed under the exclusionary provision."[6]

Below, SIC contended that the eight-corners rule did not govern its liability for defense costs, as the self-insured retention endorsement ("SIR endorsement") to the City's policy converted SIC's obligation from a duty to defend to a duty to reimburse.  According to SIC, the duty to reimburse is narrower than the duty to defend, extending only to those costs actually related to litigating covered claims.  The City disputed SIC's characterization of the policy, noting that it prominently provides that "[SIC] will have the right and

---

[1] *Nat'l Cas. Co. v. W. World Ins. Co.*, 669 F.3d 608, 612 (5th Cir. 2012) (citing *Nat'l Union Fire Ins. Co. v. Merchs. Fast Motor Lines*, 939 S.W.2d 139, 141 (Tex. 1997)).

[2] *Nat'l Cas. Co.*, 669 F.3d at 618; *see also Zurich Am. Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487, 491 (Tex. 2008) ("If a complaint potentially includes a covered claim, the insurer must defend the entire suit.").

[3] *Zurich Am.*, 268 S.W.3d at 491.

[4] *See id.* at 495-96 ("The duty to defend is not negated by the inclusion of claims that are not covered; rather, it is triggered by the inclusion of claims that might be covered.").

[5] *See Nat'l Cas. Co.*, 669 F.3d at 616.

[6] *Id.* (citing *St. Paul Ins. Co. v. Tex. Dep't of Transp.*, 999 S.W.3d 881, 887 (Tex. Ct. App. 1999)).

duty to defend any 'suit' seeking [covered] damages" and urging that the only effect of the SIR endorsement was to set forth a $250,000 self-insured retention amount below which SIC's duty did not attach. In the alternative, the City contended that the duty to reimburse is measured by the same metric as the duty to defend. The district court implicitly agreed with the City, applying the eight-corners rule to determine SIC's liability for defense costs. On appeal, SIC relies exclusively on the argument that the eight-corners rule does not trigger liability, abandoning its earlier contention that the City's policy did not impose a duty to defend. We hold SIC to its forfeiture and turn to apply the eight-corners rule to the facts of this case.[7]

SIC issued the City a policy that covers liability arising out of "wrongful act[s]" by city officials, including errors, misstatements, misleading statements, neglect, breach of duty, misfeasance, malfeasance, and nonfeasance. SIC implicitly concedes that the municipal wrongdoing alleged in WRI's complaint against the City triggers coverage, and the only issue in dispute is whether the City's alleged wrongdoing nonetheless falls within the scope of the policy's "inverse condemnation" exclusion. The exclusion provides that "this insurance does not apply to any liability . . . actually or allegedly arising out of or caused or contributed to by or in any way connected with any principle of eminent domain, condemnation proceeding, [or] inverse condemnation . . . by whatever name called." SIC insists that "all the allegations made and the damages sought by WRI in the underlying lawsuit" fall within the ambit of the exclusion, as they all "arose from the City's alleged improper refusal to grant the requested zoning change." The City rejoins that its potential liability under WRI's equal protection, substantive due process, and tortious interference claims is independent of any just-compensation liability "arising out of" the inverse

---

[7] *See, e.g.*, *Swindle v. Livingston Parish Sch. Bd.*, 655 F.3d 386, 392 n.6 (5th Cir. 2011).

condemnation action, and that SIC therefore had a duty to defend or fund the entire litigation. We agree with the City.

In assessing whether the allegations in a complaint fall within the scope of an exclusion, a reviewing court must interpret the complaint liberally and construe the exclusion narrowly, resolving any ambiguity in favor of the insured.[8] If the insured proffers a reasonable interpretation of the exclusion favorable to coverage, a reviewing court *must* accept it, even if the insurer proffers an interpretation negating coverage that is "more reasonable or a more accurate reflection of the parties' intent."[9] Turning to the language of the exclusion at issue here, the phrase "inverse condemnation" is a legal term of art used to refer to an action brought by a property owner seeking just compensation for a regulatory "taking."[10] And under background norms of constitutional law, zoning decisions ordinarily do not amount to regulatory takings unless they mandate physical intrusion on the owner's property; totally deny the owner the beneficial use of his property; or have a severe economic impact on the owner's reasonable investment-backed expectations.[11] WRI's second amended complaint

---

[8] *Zurich Am.*, 268 S.W.3d at 491.

[9] *Lexington Ins. Co. v. Nat'l Oilwell NOV, Inc.*, 355 S.W.3d 205, 213 (Tex. Ct. App. 2011) (citing *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 133 (Tex. 2010)).

[10] *E.g.*, BLACK'S LAW DICTIONARY 310 (8th ed. 2004) (defining "inverse condemnation" as "an action brought by a property owner for compensation from a governmental entity that has taken the owner's property without bringing formal condemnation proceedings"); *see also Tekelec, Inc. v. Verint Sys., Inc.*, 708 F.3d 658, 665 (5th Cir. 2013) ("Under Texas law, the words of a contract must be read in context, and technical or legal terms of art must be given their technical or legal meaning.").

[11] *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (O'Connor, J.); *see also id.* ("Although our regulatory takings jurisprudence cannot be characterized as unified, [our] three inquiries (reflected in *Loretto*, *Lucas*, and *Penn Central*) share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain. Accordingly, each of these tests focuses directly upon the severity of the burden that

alleged that the City's zoning decisions "had a significant negative impact on WRI's investment-backed expectations" and "rendered WRI's investment [in its property] worthless" — allegations that state a regulatory taking claim and fall within the ambit of the inverse condemnation exclusion.  However, as the City observes,  the complaint also alleged facts sufficient to create a possibility of liability wholly independent of WRI's inverse condemnation action — liability that could "arise" whether or not the City's zoning decisions amount to a taking that warrants just compensation.

We begin by examining WRI's allegation that the City's zoning decisions were discriminatory and driven by an irrational animus toward WRI and Walmart, depriving WRI of its right to equal protection.  To understand why these allegations create the potential of liability "arising" independently of WRI's inverse condemnation action, an extreme illustration is helpful.  Suppose that a municipality has a policy or custom of imposing zoning restrictions on properties purchased by racial minorities — restrictions that do not physically intrude on the properties and reduce their value by only about 1%.  No one would argue that such restrictions amount to regulatory takings; however, the municipality would still be liable for violating the Equal Protection Clause.[12]  To say that the municipality's liability in such circumstances "arises out of" an "inverse condemnation" action is untenable — the liability arises out of the city's constitutional malfeasance.  And the same general logic applies here.[13]  Though the allegations of discrimination in WRI's complaint are less compelling than the

---

government imposes upon private property rights.").

[12] *See* 42 U.S.C. § 1983; *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694–95 (1978).

[13] *Cf., e.g., City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985) (concluding that city's refusal to grant special use permit to home for the mentally retarded violated the Equal Protection Clause, as it lacked a rational basis).

No. 12-20746

facts of our hypothetical, the duty to defend is triggered even by frivolous or groundless allegations.[14]

We next consider WRI's related allegation that the City's zoning decisions were arbitrary — driven by an irrational bias against WRI and Walmart — and therefore violated WRI's right to substantive due process.  Again, we are satisfied that these allegations create the possibility of liability "arising" independently of WRI's inverse condemnation action.  Another example is useful to illustrate our reasoning.  Suppose that the City had issued an ordinance, on the whim of a killjoy city council member, closing Texas A&M University's Kyle Field to SEC games.  Such an ordinance would not necessarily amount to a regulatory taking or support an inverse condemnation action for just compensation; however, it might lack a rational basis, depriving the University of its right to substantive due process as set forth in this Court's decision in *Shelton v. City of College Station*.[15]  The municipality's liability would "arise" not from an "inverse condemnation" proceeding, but from its constitutional malfeasance, *i.e.,* its irrational decision-making.  And the same general logic applies in this case, notwithstanding the relatively mundane nature of the allegations supporting WRI's substantive due process claim.

Finally, we examine WRI's allegation that individual city council members conspired with third-party landowners to poach WRI's prospective tenants, thereby tortiously interfering with WRI's contracts and business expectancies. WRI claimed that the City's zoning decisions were part of the effort to drive away WRI's suitors.  However, WRI's tortious interference claim was colorable even in the absence of a regulatory taking as long as WRI could prove that the council members intended the regulations to drive away WRI's prospective

---

[14] *Zurich Am.*, 268 S.W.3d at 491.

[15] 780 F.2d 475, 482 (5th Cir. 1986) (en banc) ("We hold that the outside limit upon a state's exercise of its police power in zoning decisions is that they must have a rational basis.").

10

tenants, and that the regulations did, in fact, achieve that end.[16]  Hence, the allegations create the possibility of liability "arising" not out of an "inverse condemnation" proceeding, but out of the city council members' tortious conduct. It matters not that the City was ultimately able to assert a successful sovereign immunity defense to the tortious interference claims: the point of the insurance policy was to require SIC to assert and litigate or fund that defense.

SIC rejoins that its policy was intended to exclude all liability "arising out of" *any* of the City's zoning decisions, and that here, all of the damages WRI alleged in the underlying suit flowed from such decisions — whether those decisions are characterized as constitutional violations or tortious interference. But this reasoning is based on a flawed premise.  As the City observes, SIC's policy did *not* exclude all liability arising out of any zoning decisions, as some municipal liability insurance policies do.[17]  Instead, it excluded liability "arising out of . . . any principle of eminent domain, condemnation proceeding, [or] inverse condemnation."  This language cannot reasonably be read to extend to liability arising out of *all* zoning decisions.  Fairly read, it covers just-compensation liability arising out of a condemnation proceeding or an inverse condemnation action.  And even if the exclusion were ambiguous, any doubt must be resolved in the City's favor.[18]  As WRI's constitutional and tortious interference claims may produce liability that does not "arise out of" WRI's inverse condemnation action, SIC is liable for the City's defense costs.

---

[16] *See Faucette v. Chantos*, 322 S.W.3d 901, 913–14 (Tex. Ct. App. 2010) (setting forth elements of tortious interference claim).

[17] *See, e.g.*, *Nat'l Cas. Co. v. Newtown Twp.*, No. A99-6524, 2000 WL 1052142, at *1 (E.D. Pa. July 24, 2000) (discussing a similar policy that excluded all "damages arising out of land use planning or municipal zoning").

[18] *E.g.*, *Admiral Ins. Co. v. Rio Grande Heart*, 64 S.W.3d 497, 502 (Tex. Ct. App. 2001).

No. 12-20746

## III.

The next question is whether the district court erred in concluding, on summary judgment, that SIC had no duty to indemnify the City for its settlement with WRI. An insurer's duty to indemnify is distinct from its duty to defend: whereas the duty to defend is exclusively a function of the facts alleged in the pleadings, the duty to indemnify must generally be determined on the basis of the actual evidence pertaining to liability developed during discovery or at trial.[19] This rule controls unless "the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify," in which case an insurer's duty to indemnify can be determined on the basis of the pleadings alone.[20] Here, the district court reasoned that "given the broad and comprehensive nature of the [inverse-condemnation] exclusion, . . . there could be no facts in the settlement that would alter the Court's conclusion that all of WRI's claims originate from its alleged inverse condemnation claim." But as we have explained, the pleadings *did* raise a possibility of municipal liability independent of any just-compensation liability arising out of WRI's inverse condemnation action. On remand, the district court shall allow the parties to introduce evidence regarding SIC's indemnity obligation.

## IV.

The third issue on appeal is whether SIC's failure to furnish the City with defense benefits or indemnity entitles the City to statutory penalty interest under § 542.058 of the Texas Insurance Code. Under § 542.058, otherwise known as the "prompt-payment rule," an insurer who fails to pay defense costs

---

[19] *Zurich Am.*, 268 S.W.3d at 490.

[20] *Farmers Tex. Cnty. Mut. Ins. Co. v. Griffin*, 955 S.W.2d 81, 84 (Tex. 1997).

12

or indemnity within the statutorily specified time-frame is liable not only for the costs or indemnification but also for an 18% per annum penalty interest rate.[21] Here, the district court concluded that SIC could not be liable for the statutory penalty rate, as it had no duty to defend or indemnify. But SIC *did* have a duty to defend and *may* have a duty to indemnify, pulling the rug out from under the district court's reasoning. On remand, the district court shall assess § 542.058 penalty interest in a manner consistent with our reasoning in this opinion.

## V.

The final question before us is whether SIC is liable for the City's attorney's fees *in this litigation* (not in the underlying litigation with WRI) under § 38.001 of the Texas Civil Practice and Remedies Code. Section 38.001 provides that "a person may recover reasonable attorney's fees" in an action for breach of contract. The Texas Supreme Court has clarified that § 38.001 attorney's fees are awarded on a claim-by-claim basis, and that a party must prevail on a claim in order to receive fees on that claim.[22] Here, the district court concluded that SIC was not liable for any of the City's attorney's fees, as the City had not established breach of the insurance contract. Again, the district court's reasoning is undermined by the fact that SIC *did* breach its duty to defend and *may* have also breached its duty to indemnify. However, as it is not yet clear whether the City will prevail on its indemnity claim, or how much of the City's attorney's fees are attributable to litigating the indemnity claim, we leave to the district court the determination of any § 38.001 fee award.

---

[21] *Higginbotham v. State Farm Mut. Auto. Ins. Co.*, 103 F.3d 456, 461 (5th Cir. 1997) ("[I]f an insurer fails to pay a claim, it runs the risk of incurring [an] 18 percent statutory fee and reasonable attorney's fees."); *see also Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 4, 19 (Tex. 2007) (clarifying, on certification by the Fifth Circuit, that the statutory prompt-payment rule applies to an insurer's breach of the duty to defend).

[22] *See Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 389–90 (Tex. 1997).

No. 12-20746

## VI.

We REVERSE the judgment of the district court and REMAND for further proceedings consistent with our opinion.