**Opinion filed December 12, 2019**



## In The

# Eleventh Court of Appeals

_____

## No. 11-17-00283-CV

_____

## LANCE DUNCAN AND MARK IV ENERGY HOLDINGS, LLC, F/K/A MARK III ENERGY HOLDINGS, LLC, Appellants
## V.
## GERALD B. HINDY; ASSEMBLIES OF GOD FINANCIAL SERVICES GROUP, D/B/A AG FINANCIAL SOLUTIONS; AND STEWARD ENERGY FUND, LLC, Appellees

**On Appeal from the 70th District Court**
**Ector County, Texas**
**Trial Court Cause No. A-16-05-0551-CV**

## O P I N I O N

This appeal arises from a business dispute concerning a large financial investment in oil and gas properties. It involves multiple written agreements executed by the parties as well as litigation between the parties in multiple counties over a period of time. The trial court granted summary judgment in favor of Appellees—Gerald B. Hindy; Assemblies of God Financial Services Group, d/b/a AG Financial Solutions;[1] and Steward Energy Fund, LLC—on all of Appellants'

---

[1]We will refer to Assemblies of God Financial Services Group as "AG Financial Solutions" in this opinion.

claims. Appellants, Lance Duncan and Mark IV Energy Holdings, LLC, f/k/a Mark III Energy Holdings, LLC, filed the underlying suit asserting numerous causes of action.[2] Appellants contend that the trial court erred by granting summary judgment in favor of Appellees on Appellants' claims for tortious interference with a contract, wrongful foreclosure, and declaratory relief. We affirm.

*Background Facts*

In 2008, Hindy, the president and CEO of AG Financial Solutions, met with Duncan to discuss investing in the oil and gas industry. Duncan identified certain oil and gas properties (the Batson and Wortham leases) for AG Financial Solutions to consider purchasing. AG Financial Solutions formed Steward Energy to purchase the Batson and Wortham leases. Hindy was also the president of Steward Energy. Steward Energy purchased the Batson leases from Shamrock Energy Corporation for $6,000,000 and the Wortham leases from Mark III for $4,500,000. After the sales, Duncan operated the leases through his entity, BHB Operating, Inc., and received a monthly operating fee.

Appellees soon discovered that the Wortham leases were producing significantly less oil and gas than what Duncan had represented prior to the sale and that, due to high operating expenses, the Wortham leases were not profitable. In 2009, Mark III agreed to pay Steward Energy $1,080,000 to resolve this dispute.

In 2010, AG Financial Solutions and Steward Energy sued Duncan in Freestone County, asserting additional claims related to the Batson and Wortham transactions, including breach of fiduciary duty, fraud based on intentional misrepresentations and failure to disclose, and negligent misrepresentation. In August 2010, Steward Energy, Mark III, BHB Operating, Duncan, and Duncan's wife, Holly Duncan, entered into a "Settlement Agreement and Release" of the

---

[2]We note that there were additional plaintiffs and defendants in the case below but that those additional parties are not parties to this appeal.

2

Freestone County claims. The Settlement Agreement and Release provided (1) that Steward Energy would convey the Batson and Wortham leases to Mark III, (2) that Appellants and Holly Duncan would execute a promissory note payable to Steward Energy in the principal amount of $9,500,000, (3) that payment on the promissory note would be secured by a deed of trust on the Batson and Wortham leases and on other leases known as the Garner and Sanford Leases, (4) that Mark III would drill five new oil wells on the Batson property, and (5) that Appellants and Holly Duncan would sign a Confession of Judgment for $6,000,000 plus postjudgment interest at an annual rate of five percent. The Confession of Judgment provided that the $6,000,000 principal amount was "subject to a dollar-for-dollar credit and/or offset based upon any and all payments made" by Appellants according to the terms of the promissory note. The Freestone County district court signed the Confession of Judgment on September 14, 2010.

On February 28, 2013, AG Financial Solutions and Steward Energy executed a settlement agreement with Appellants, BHB Operating, and Holly Duncan to resolve a dispute arising from a lawsuit in Lubbock County (the February 28 Settlement Agreement). Appellants acknowledged in the February 28 Settlement Agreement that the Confession of Judgment remained unpaid in the amount of $6,000,000 and that interest had accrued on that amount at an annual rate of five percent. The parties to the February 28 Settlement Agreement agreed (1) that the $6,000,000 judgment balance would be reduced only as the unpaid balance on all outstanding sums owed to Steward Energy was reduced below $6,000,000 and (2) that, as Appellants, BHB Operating, or Holly Duncan reduced the unpaid balance owed to Steward Energy below $6,000,000, Steward Energy would provide a corresponding dollar-for-dollar reduction on the Confession of Judgment.

On August 2, 2013, Steward Energy, as lender, and Appellants, BHB Operating, and Holly Duncan, as borrowers, signed a Loan Agreement (the

Consolidated Loan Agreement), which acknowledged that the promissory note relating to the Confession of Judgment had an outstanding balance of $7,295,044.84, that the Duncans owed Steward Energy $401,521.33 under a separate promissory note, and that both notes were in default. The Consolidated Loan Agreement (1) consolidated the remaining debt of Appellants, BHB Operating, and Holly Duncan into a single loan and deed of trust, (2) waived the existing defaults, and (3) lowered the monthly payments. Appellants, BHB Operating, and Holly Duncan signed a "Deed of Trust, Assignment of Leases, Rents, Revenues, Security Agreement and Fixture Filing" (the Deed of Trust) that secured the Consolidated Loan Agreement. Appellees recorded the Deed of Trust in Ector County on August 28, 2013.

In September 2014, Mark III and other companies entered into a purchase and sale agreement (PSA) to sell their collective 70% working interest in certain Ector County oil and gas leases to Ryder Operating, LLC for approximately $7,700,000. The closing date for the transaction was November 28, 2014. On November 19, 2014, a company called Ride the Wave, LLC filed suit against Appellants and BHB Operating, alleging that Duncan had refused to assign a working interest in the Ector County lease that Ride the Wave had purchased two years before. On November 25, 2014, Ryder Operating terminated the PSA, asserting that (1) Mark III breached the PSA by misrepresenting that there were no threatened suits against the Ector County property at the time the agreement was entered and (2) Mark III, a forfeited entity since July 2010, misrepresented in the PSA that it was validly existing and in good standing.

Appellants remained in default of the Consolidated Loan Agreement in multiple respects. As a result, Steward Energy foreclosed on Appellants' assets, including Duncan's lake house in December 2014, the interest in the Batson and Wortham leases in February 2015, and the interest in the Ector County leases in March 2015.

4

On May 31, 2016, Appellants filed the underlying suit against Appellees. Appellants brought multiple claims against Appellees, including tortious interference with an existing contract, civil conspiracy to tortiously interfere with an existing contract, duress, civil conspiracy to breach a fiduciary duty (aiding and abetting), common law fraud, promissory estoppel, intentional infliction of emotional distress, alter ego liability, fraudulent lien, and wrongful foreclosure. Appellants also sought a declaratory judgment construing the parties' rights under the February 28 Settlement Agreement and the Consolidated Loan Agreement with respect to the provisions in those agreements that purported to modify the Confession of Judgment. Appellees answered and asserted a number of affirmative defenses, including release and res judicata.

Appellants and Appellees filed competing motions for summary judgment. After a hearing, the trial court granted Appellees' traditional and no-evidence motion for summary judgment and denied Appellants' traditional and no-evidence motion for partial summary judgment. Appellants have appealed the trial court's judgment only as to (1) Appellants' claims for tortious interference with the PSA and wrongful foreclosure, (2) Appellants' request for declaratory relief, (3) Appellants' contention that Steward Energy is the alter ego of AG Financial Solutions, and (4) Appellees' defenses of res judicata and release.

*Analysis*

In their first three issues, Appellants assert that the trial court erred in granting summary judgment in favor of Appellees as to Appellants' claims for tortious interference with contract and wrongful foreclosure and Appellants' request for declaratory relief. We review a trial court's entry of summary judgment de novo. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017). When the trial court's order fails to specify the grounds for its summary judgment, we will affirm if any of the theories are meritorious. *Provident Life &*

5

*Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 216 (Tex. 2003). When both parties move for summary judgment, and one is granted and the other denied, we must review all the summary judgment evidence, determine all issues presented, and render the judgment that the trial court should have rendered. *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

After adequate time for discovery, a party may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. TEX. R. CIV. P. 166a(i). We review a no-evidence motion for summary judgment under the same legal sufficiency standard as a directed verdict. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Under this standard, the nonmovant has the burden to produce more than a scintilla of evidence to support each challenged element of its claims. *Id.*

A party moving for traditional summary judgment bears the burden of proving that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). To be entitled to traditional summary judgment, a defendant must conclusively negate at least one essential element of the cause of action being asserted or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). If the movant initially establishes a right to summary judgment on the issues expressly presented in the motion, then the burden shifts to the nonmovant to present to the trial court any issues or evidence that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979).

6

In reviewing both traditional and no-evidence summary judgments, we consider the evidence in the light most favorable to the nonmovant, indulging every reasonable inference in favor of the nonmovant and resolving any doubts against the movant. *Merriman*, 407 S.W.3d at 248; *City of Keller*, 168 S.W.3d at 824. "If a party moves for summary judgment on both traditional and no-evidence grounds, as the parties did here, we first consider the no-evidence motion." *Lightning Oil Co.*, 520 S.W.3d at 45.

*Declaratory Judgment*

In their second issue, Appellants assert that the trial court erred by granting summary judgment in favor of Appellees on Appellants' request for declaratory relief. Appellants pleaded that the February 28 Settlement Agreement and the Consolidated Loan Agreement, both of which were executed in 2013, were improper collateral attacks on the 2010 Confession of Judgment. Appellants requested that the trial court "issue a declaratory judgment declaring the parties' rights under these agreements, with respect to the provisions purporting to modify the Confession of Judgment." Specifically, Appellants sought a declaration that the subsequent agreements were "void, voidable, or otherwise invalid" to the extent that they attempted to modify the Confession of Judgment.

Appellees moved for traditional summary judgment on Appellants' request for declaratory relief on the grounds that the requested relief was barred by the doctrine of res judicata. As set out below, Appellants based their claim of res judicata on litigation occurring between the parties in Freestone County in 2016 in a turnover proceeding. Appellants moved for no-evidence summary judgment on Appellees' res judicata affirmative defense on grounds that there was no evidence that Appellants' request for declaratory relief was based on the same claims as were raised or could have been raised in prior litigation between the parties. We conclude that Appellees established their affirmative defense of res judicata as a matter of law.

7

Res judicata, or claim preclusion, is an affirmative defense that prevents the litigation by parties and their privies of matters actually litigated in a previous suit, as well as matters that, with the use of diligence, could have been litigated in a prior suit. *Hallco Tex., Inc. v. McMullen Cty.*, 221 S.W.3d 50, 58 (Tex. 2006); *see also* TEX. R. CIV. P. 94 (identifying res judicata as an affirmative defense). Texas applies the transactional approach to res judicata, which requires that claims arising out of the same subject matter be litigated in a single lawsuit. *Hallco*, 221 S.W.3d at 58. "The party relying on the affirmative defense of res judicata must prove (1) a prior final determination on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were or could have been raised in the first action." *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

In September 2016, while this case was pending in the trial court, Appellees learned that BHB Operating had recently entered into a settlement agreement in an unrelated lawsuit and received settlement proceeds of $475,000. Appellees filed an Application for Turnover Relief in Freestone County on September 14, 2016. Appellees asserted in their Application for Turnover Relief that Appellants and BHB Operating still owed money under the Confession of Judgment. Appellants and BHB Operating initially filed a response wherein they disputed the amount due under the Confession of Judgment. They argued that all lawful offsets, payments, and credits had not been accounted for by Appellees. The Freestone County district court held a hearing and, following the receipt of evidence and arguments, signed an order granting Appellees' application for turnover relief on September 23, 2016. The Freestone County district court determined that Appellees had "a valid and enforceable Confession of Judgment against Defendants in the unpaid amount of $517,113.38."

Appellants and BHB Operating then filed a motion for reconsideration in the turnover proceeding, asking the Freestone County district court to find that the Confession of Judgment had been completely satisfied because it required a "dollar-for-dollar credit and/or offset based upon *any and all* payments" made by them to Appellees according to the terms of the promissory note signed in connection with the Confession of Judgment.  Appellants and BHB Operating attached copies of the Confession of Judgment and the Consolidated Loan Agreement to the motion for reconsideration.

Appellees filed a response to the motion for reconsideration, arguing that the allocation of payments toward the Confession of Judgment was clarified by the Consolidated Loan Agreement and the February 28 Settlement Agreement, both of which they attached to their response.  Appellants and BHB Operating filed a reply brief, asserting that the turnover order was void because it was based on Appellees' position that the Confession of Judgment was modified or amended by the subsequent agreements.  Following a hearing, the Freestone County district court denied the motion for reconsideration on March 28, 2017.

Appellants and Appellees agree that the turnover order issued by the Freestone County district court serves as a prior final judgment on the merits between the parties.  However, the parties dispute whether the summary judgment evidence establishes that Appellants' claim for declaratory relief in this case was raised or could have been raised in the turnover proceeding in Freestone County.

Appellants contend that the turnover proceeding could not serve as a basis for an application of res judicata.  Appellants assert that the turnover order did not involve the validity of the February 28 Settlement Agreement or the Consolidated Loan Agreement.  In some respects, Appellants are asserting a timing argument based on the fact that the turnover order was entered prior to Appellants presenting the arguments in their motion for reconsideration about the subsequent agreements.

9

Appellants additionally assert that Appellees did not disclose their reliance on the subsequent agreements until after the entry of the turnover order.[3]

A turnover proceeding is a postjudgment statutory proceding. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 31.002 (West Pamph. Supp. 2019). "The Texas turnover statute provides judgment creditors with a procedural device to assist them in satisfying their judgment debts." *Alexander Dubose Jefferson & Townsend LLP v. Chevron Phillips Chem. Co., L.P.*, 540 S.W.3d 577, 581 (Tex. 2018). A turnover proceeding is "purely procedural in nature" and is limited in scope. *Kothmann v. Cook*, 113 S.W.3d 471, 475 (Tex. App.—Amarillo 2003, no pet.).

Despite the fact that a turnover proceeding is limited in nature, the judgment debtor is required to plead and prove affirmative defenses to the turnover order sought by the judgment creditor. *See* W. Mike Baggett, 15 *Texas Practice Series: Texas Foreclosure: Law and Practice* § 13.19 (2019) (citing *Matrix, Inc. v. Provident Am. Ins. Co.*, 658 S.W.2d 665 (Tex. App.—Dallas 1983, no writ)). "To avoid waiver, a judgment debtor should plead available defenses both to enforcement of the turnover order and to the underlying judgment sought to be enforced." 5 Roy W. McDonald & Elaine A. Grafton Carlson, *Texas Civil Practice* § 31:73 (2d ed. 2018) (citing *Matrix*, 658 S.W.2d at 667). In *Matrix*, the Dallas Court of Appeals held that the judgment debtor's claims that all or a portion of the judgment had been paid, or that a set-off had occurred, were affirmative defenses to the turnover proceeding that must be pleaded and proved. 658 S.W.2d at 667. The failure of the judgment debtor to plead and prove these affirmative defenses

---

[3]Appellants also assert in their brief that Appellees "committed fraud upon the Freestone County district court by intentionally omitting from its evidence the existence" of the February 28 Settlement Agreement and the Consolidated Loan Agreement as well as numerous payments Appellants allegedly made to Appellees. Appellants assert that Appellees "should be barred from asserting res judicata on the basis of unclean hands." However, Appellants did not argue in the trial court that Appellees were not entitled to summary judgment based on "unclean hands." Appellant may not make that argument for the first time on appeal. *See Knapp v. Wilson N. Jones Mem'l Hosp.*, 281 S.W.3d 163, 170 (Tex. App.—Dallas 2009, no pet.) ("To preserve an error for appeal, a party's argument on appeal must comport with its argument in the trial court.").

prevented the judgment debtor from raising the matters in an appeal from the turnover order. *Id.*

In their Fifth Amended Original Petition filed in this case, Appellants asserted that the parties executed a Confession of Judgment subject to a dollar-for-dollar credit offset based upon all payments made by Appellants. Appellants claimed that they were not credited dollar-for-dollar for all payments that they made to Appellees as required by the Confession of Judgment. Appellants sought a declaration that the February 28 Settlement Agreement and the Consolidated Loan Agreement are void, voidable, or otherwise invalid "insofar as they purport to alter, modify, or interpret the express terms" of the Confession of Judgment. Thus, Appellants' declaratory judgment claim is the same claim that they asserted in their motion for reconsideration in Freestone County—that the turnover order was void because the February 28 Settlement Agreement and the Consolidated Loan Agreement could not modify or amend the provisions of the Confession of Judgment arising from the litigation in Freestone County.

Under the transactional approach to res judicata, the subject matter of a suit is based on "the factual matters that make up the gist of the complaint." *Barr v. Resolution Trust Corp.*, 837 S.W.2d 627, 630 (Tex. 1992). Any claim arising out of those facts should be litigated in the same suit. *Id.* Appellants' requested declaratory relief is a claim that was either actually raised or could have been raised in the turnover proceeding, particularly when one considers that it is in the nature of an affirmative defense of payment or offset to the turnover proceeding. We conclude that Appellees conclusively established that Appellants' request that the trial court declare the February 28 Settlement Agreement and the Consolidated Loan Agreement void, voidable, or otherwise invalid to the extent that they purport to alter, modify, or interpret the terms of the Confession of Judgment arises from the same factual matters as did the turnover order in the Freestone County litigation and

11

should have been litigated in that suit. *See Travelers Ins. Co.*, 315 S.W.3d at 862. Therefore, the trial court did not err by granting Appellees' traditional motion for summary judgment on Appellants' request for declaratory judgment on the ground that Appellants' cause of action was barred by the affirmative defense of res judicata or by denying Appellants' no-evidence motion for summary judgment on that affirmative defense. We overrule Appellants' second issue.

*Wrongful Foreclosure*

In their third issue, Appellants assert that the trial court erred by granting Appellees' traditional and no-evidence motion for summary judgment and denying Appellants' traditional motion for summary judgment on Appellants' wrongful foreclosure claim. Appellants pleaded that Appellees foreclosed on Appellants' interests in the Batson and Wortham leases, the Ector County leases, and Duncan's lake house under a "forged" deed of trust. Appellants moved for traditional summary judgment on the ground that the "forged" deed of trust was void and did not convey any interest in the properties to Appellees, causing a wrongful foreclosure. Appellees moved for summary judgment on the grounds that Appellants could produce no evidence of any of the elements of wrongful foreclosure and that the evidence conclusively established that Appellees had a right to foreclose under the underlying deeds of trust.

To establish a claim for wrongful foreclosure, a plaintiff must prove the following: (1) a defect in the foreclosure sale proceedings; (2) a grossly inadequate selling price; and (3) a causal connection between the defect and the grossly inadequate selling price. *Montenegro v. Ocwen Loan Servicing, LLC*, 419 S.W.3d 561, 569 (Tex. App.—Amarillo 2013, pet. denied). Because it is dispositive, we first address whether Appellants produced more than a scintilla of evidence of a defect in the foreclosure sale proceedings due to a forged deed of trust.

Appellants assert that the deed of trust was forged due to events that transpired between August 2, 2013, and the recording of the deed of trust in Ector County on August 28, 2013. All interested parties signed a deed of trust on August 2, 2013, in connection with the Consolidated Loan Agreement. On August 22, 2013, Jim Hering, an attorney for Steward Energy, e-mailed Duncan's attorney, Keith Thompson, about the deed of trust. Hering informed Thompson that he made two additions to the deed of trust: (1) filling in the date that the loan agreement was signed and (2) adding paragraph 6.4(f)(x), which read:

> It is expressly understood and agreed that nothing in this Deed of Trust modifies or supersedes Beneficiary's right to enforce the Abstracted Confession of Judgment rendered against Mark III Energy Holdings, LLC, Lance W. Duncan and BHB Operating, Inc. in the original principal amount of $6,000,000.00.

A third change was made but not mentioned in Hering's e-mail: the deletion of forty-five words from various sentences in paragraph 6.4(f)(viii).[4] Hering stated that he

---

[4] The forty-five words deleted from paragraph 6.4(f)(viii) were as follows as reflected by "strikethrough" text:

> (viii) In the event an interest in any of the Property is foreclosed upon ~~pursuant to a judicial or nonjudicial foreclosure sale,~~ Grantor agrees as follows: notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code ~~(as the same may be amended from time to time), and to the extent permitted by law,~~ Grantor agrees that Beneficiary shall be entitled to seek a deficiency judgment from Grantor and any other party obligated on the Secured Obligations equal to the difference between the amount owing on the Secured Obligations and the amount for which the Property was sold pursuant to ~~judicial or nonjudicial~~ foreclosure sale. Grantor expressly recognizes that this section constitutes a waiver of the above-cited provisions of the Texas Property Code which ~~would~~ otherwise permit Grantor, ~~Obligor, and other persons against whom recovery of deficiencies is sought~~ or any guarantor independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor ~~further recognizes and~~ agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Property for purposes of calculating deficiencies owed by Grantor, Obligor, or any guarantor, and others against whom ~~recovery of~~ a deficiency is sought.

had attached "the Deed of Trust that [Hering was] sending for recording." Hering e-mailed Thompson again the following day, August 23, 2013, explaining that, as he prepared to send the deed of trust for recording, he noticed that one of the signatures was missing a notary stamp. Hering then mailed Thompson a copy of the updated deed of trust, which he referred to as the "original Deed of Trust," that included the changes noted above and the signature pages executed on August 2, 2013. Hering asked Thompson to have Duncan sign new signature pages on the updated deed of trust "in front of a notary public" and return it to him.

Thompson did not follow Hering's instructions. Thompson testified in a deposition that he did not recall receiving Hering's e-mail on August 22 about the changes made to the deed of trust but that he did recall the e-mail from August 23 requesting Duncan's notarized signature. Thompson explained that he simply added a notary stamp to the original August 2, 2013 signature pages and returned those pages to Hering—without notifying Hering that he did not have Duncan sign the updated deed of trust. Hering recorded the updated deed of trust in Ector County on August 28, 2013, as well as filing it in Kent, Hardin, Freestone, and Limestone Counties on or after August 28. Appellees foreclosed on Mark III's working interest in the Ector County leases on March 3, 2015, Duncan's lake house on December 2, 2014, and Mark III's interest in the Batson and Wortham leases on February 3, 2015.

Appellants contend that the updated deed of trust was a forgery because it was altered after Appellants and Holly Duncan signed the previous version. Appellants assert that the foreclosure was wrongful because Appellees foreclosed upon a version of the deed of trust that had not been signed by Appellants and Holly Duncan.

A forged deed is void *ab initio* and passes no title. *Morris v. Wells Fargo Bank, N.A.*, 334 S.W.3d 838, 843 (Tex. App.—Dallas 2011, no pet.); *see Commonwealth Land Title Ins. Co. v. Nelson*, 889 S.W.2d 312, 318 (Tex. App.—

Houston [14th Dist.] 1994, writ denied) ("when a document is void or void *ab initio* it is as if it did not exist because it has no effect from the outset"). Thus, Appellees could not foreclose under a void deed of trust. *1st Coppell Bank v. Smith*, 742 S.W.2d 454, 457 (Tex. App.—Dallas 1987, no writ), *disagreed with on other grounds by Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 678 (Tex. 2000).

We disagree with Appellants' assertion that the updated deed of trust was forged. "A document is forged if it is signed by one who purports to act as another." *Vazquez v. Deutsche Bank Nat'l Tr. Co.*, 441 S.W.3d 783, 788 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (citing *Nobles v. Marcus*, 533 S.W.2d 923, 925–26 (Tex. 1976)). Appellants presented no evidence that any of the signatures on the deed of trust were made "by one who purports to act as another." *See Nobles*, 533 S.W.2d at 926. In this regard, there is no evidence that anyone except Lance Duncan (individually, as "sole member" of Mark III, and as president of BHB Operating) and Holly Duncan signed their names on the deed of trust.

The dispute in this case involves changes that were made to the deed of trust after it was executed by the Duncans. Appellees assert that this case is analogous to the circumstances in *American Savings & Loan Ass'n of Houston v. Musick*, 531 S.W.2d 581, 585–86 (Tex. 1975). We agree. *Musick* involved an allegation that a deed of trust was forged because it was altered after execution. 531 S.W.2d at 585–86. The Texas Supreme Court determined that the alleged alterations of the deed of trust did not make it void because they were not material. *Id.*

The test of whether an alteration is material is "whether the altered writing describes the contract entered into by the parties, or whether the instrument's legal effect has been varied." *Frost Nat'l Bank v. Burge*, 29 S.W.3d 580, 588 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (quoting *Spin-Line Co. v. United Concrete Pipe Corp.*, 420 S.W.2d 744, 751 (Tex. App.—Dallas 1967), *aff'd in part, rev'd in part*, 430 S.W.2d 360 (Tex. 1968)). "In that regard, an alteration is material

so as to render an instrument void if a change to that document causes it to 'fail to reflect the meaning and intent of the parties to the agreement.'" *Id.* (quoting *Associated Sawmills, Inc. v. Peterson*, 366 S.W.2d 844, 848 (Tex. App.—Dallas 1963, no writ)). "Whether an alteration was material is a question of law for the court to determine, and not one for a jury to decide." *Id.* (citing *Spin-Line*, 420 S.W.2d at 752); *see Perryman v. Spartan Tex. Six Capital Partners, Ltd.*, 546 S.W.3d 110, 117 (Tex. 2018) ("We construe unambiguous deeds—like any other legal instrument—as a matter of law." (citing *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991))).

The changes made by Hering did not constitute material alterations because they did not vary the meaning and intent of the parties' agreement with respect to the properties that Appellees foreclosed upon. The addition of a date by filling in a date is an addition that appeared to be contemplated by the parties. The addition of paragraph 6.4(f)(x) clarified that the deed of trust did not affect Appellees' right to enforce the Confession of Judgment. Finally, the words deleted in paragraph 6.4(f)(viii) were superfluous to the enforcement of the deed of trust by foreclosure. As was the case in *Musick*, the amended language of the updated deed of trust had no legal effect on the foreclosure because the provisions of the original deed of trust executed by Appellants and Holly Duncan permitted the foreclosure that occurred. *See* 531 S.W.2d at 585–86. Thus, Appellants failed to produce more than a scintilla of evidence that there was a defect in the foreclosure sale proceedings—the first element of Appellants' wrongful foreclosure claim. *See Merriman*, 407 S.W.3d at 248; *Montenegro*, 419 S.W.3d at 569.[5] Therefore, the trial court did not err when it granted Appellees' no-evidence motion for summary

---

[5]Because we hold that Appellants did not produce more than a scintilla of evidence on one of the essential elements of their wrongful foreclosure claim, we do not need to address the remaining two elements. *See Merriman*, 407 S.W.3d at 248; *see also* TEX. R. CIV. P. 166a(i).

16

judgment and denied Appellants' traditional motion for summary judgment on Appellants' wrongful foreclosure claim. We overrule Appellants' third issue.

*Tortious Interference with Contract*

In their first issue, Appellants assert that the trial court improperly granted Appellees' traditional motion for summary judgment on Appellants' tortious interference claim. Although Appellants brought two claims for tortious interference with a contract against Appellees, Appellants appeal only the trial court's grant of summary judgment on their claim that Steward Energy interfered with the PSA between Mark III and Ryder Operating.

Appellants pleaded that Appellees tortiously interfered with the PSA by (1) contacting Brad Salley, the principal of Ride the Wave, to ensure that Ride the Wave filed a lawsuit against Appellants before the PSA's closing date to "give [Ryder Operating] a pretext for terminating the agreement" and (2) contacting Ryan Roberts, the owner of Ryder Operating, and informing him that, if Ryder Operating did not close on the PSA, Appellees would foreclose on the Ector County interests and sell them to Ryder Operating at a reduced price, "thus inducing Roberts to breach his contract."

To establish a claim for tortious interference with an existing contract, a plaintiff must show the following: (1) that a valid contract exists and that it is subject to interference; (2) that the defendant willfully and intentionally interfered with that contract; (3) that the interference was a proximate cause of the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). Appellees moved for traditional summary judgment on grounds that, as a matter of law, the PSA was not an existing contract subject to interference, that there was no actionable interference with the PSA, and that the alleged interference did not cause the termination of the PSA.

17

We begin by examining the second element of Appellants' tortious interference claim: whether Appellees conclusively established that Appellees did not willfully and intentionally interfere with the PSA. *See id.* "[T]o establish the element of a willful and intentional act of interference, a plaintiff must produce some evidence that the defendant was more than a willing participant and knowingly induced one of the contracting parties to breach its obligations under a contract." *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). To meet this burden, the plaintiff "must present evidence that some obligatory provision of a contract has been breached." *Id.* Thus, to prevail on a claim for tortious interference with an existing contract, Appellants had to present evidence that Appellees induced Ryder Operating to breach the PSA. *See El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421–22 (Tex. 2017) (citing *Holloway v. Skinner*, 898 S.W.2d 793, 794–95 (Tex. 1995)); *Texaco, Inc. v. Pennzoil, Co.*, 729 S.W.2d 768, 803 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) ("A necessary element of the plaintiff's cause of action is a showing that the defendant took an active part in persuading a party to a contract to breach it."). As set forth below, the evidence conclusively establishes that Ryder Operating did not breach the PSA.

Appellants first contend that Appellees willfully and intentionally interfered with the PSA by contacting Salley to induce Ride the Wave, a third-party to the PSA, to file suit against Appellants prior to the closing date. The summary judgment evidence established that, beginning on September 23, 2014, Ride the Wave sent multiple demands to Mark III and Mark III's attorney threatening to file suit. On November 10, 2014, William A. Franklin, an attorney representing Ride the Wave, sent a letter to Appellants' attorney, Thompson, noting that, "for approximately two months," Ride the Wave had been attempting to obtain assurances that it would be paid from the proceeds of the sale of the oil and gas interests. Franklin requested

specific information about the amount Mark III proposed to pay to Ride the Wave and a proposal as to how Mark III intended to guarantee the payment of that sum to Ride the Wave at closing. Franklin stated that Mark III's "failure to provide all of the requested information" would leave Ride the Wave "no choice but to proceed with litigation in order to enforce" its agreements with Mark III.

On November 14, 2014, Franklin sent Thompson an e-mail stating that Mark III had failed to provide the requested information and that the "only conclusion that can be drawn from said refusal is" that Mark III "does not intend on paying Ride the Wave from the sale proceeds." Franklin indicated that, due to Mark III's refusal to provide the requested information and "the impending closing date," Ride the Wave had instructed him to proceed with litigation.

Appellants assert that text messages between Salley and Cory Meadows, a contractor for Steward Energy, suggested that they spoke on the phone on November 18—the day before Ride the Wave filed suit against Appellants—and that Meadows encouraged Salley to sue Appellants. However, the portions of the record relied upon by Appellants support only the proposition that Meadows contacted Salley. Further, Salley testified in his deposition that Meadows never told him to file the lawsuit and that neither Meadows nor Appellees ever offered Salley anything in exchange for filing suit. Salley testified that he had never spoken to Meadows prior to receiving a text message from him on November 18.

Appellants additionally assert that Appellees contacted Roberts for the purpose of inducing Ryder Operating to breach the PSA. The summary judgment evidence establishes that Roberts communicated with Meadows before Ryder Operating terminated the PSA. Appellants "contend," without any support in the record, that it "is a reasonable inference" that Steward Energy told Roberts during these communications that, if Ryder Operating terminated the PSA, Roberts could purchase the property at foreclosure for a significantly reduced price.

19

On November 21, 2014—two days after Ride the Wave filed suit against Appellants and four days before Ryder Operating terminated the PSA—Meadows contacted Roberts through a text message. The text messages between Meadows and Roberts also suggested that the two met in person on November 23. However, according to Roberts, Meadows did not tell him that the lawsuit filed by Ride the Wave and the existing liens would give Ryder Operating a basis to terminate the PSA. In his deposition, Roberts explained that he was already aware of his termination rights under the PSA by the time he spoke with Meadows. Roberts also testified that Meadows never encouraged him to terminate the PSA and then deal with Steward Energy.

The crux of Appellants' claim for tortious interference with an existing contract is that Appellees induced Ryder Operating to terminate the PSA and that this termination constituted a breach of the PSA by Ryder Operating. However, as Appellees note, the Texas Supreme Court has held that "merely inducing a contract obligor to do what it has a right to do is not actionable interference." *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997). Thus, if Ryder Operating had a permissible basis under the PSA to terminate the PSA, its decision to terminate would not constitute a breach of the PSA and would not serve as a basis for a claim for tortious inference with an existing contract. *See Faucette v. Chantos*, 322 S.W.3d 901, 914 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (relying on *ACS Investors*). The court in *Faucette* dealt with a similar situation. The plaintiff in *Faucette* asserted that the defendants induced parties to supply contracts to invoke 30-day termination provisions that were contained in the contracts. *Id.* at 913. The court determined that the defendants' actions to induce the parties to terminate the contract under the 30-day termination provision would not support a claim for tortious interference with an existing contract because the defendants induced the

20

parties "to do what [they] had a right to do" under the contract.[6] *Id.* at 914 (quoting *ACS Investors*, 943 S.W.2d at 431).

Even if we accept Appellants' alleged inference that Appellees induced Ryder Operating to terminate the PSA, Appellants would not have a cause of action against Appellees for tortious interference with an existing contract if Appellees merely induced Ryder Operating into doing what it had a contractual right to do. On November 25, 2014, Ryder Operating sent a written notification to Mark III that it was terminating the PSA pursuant to Paragraphs 15.1(a)(III) and 9.2 of the PSA. Section 15.1 of the PSA governed termination of the contract and stated in relevant part:

> (a) Termination of Agreement. This agreement and the transactions contemplated hereby may be terminated at any time at or prior to the closing:
> . . . .
>
> (iii) by buyer if any condition specified in Section 9.2 has not been satisfied on or before closing and shall not have been waived by buyer[.]

Section 9.2 of the PSA provided in relevant part:

> Section 9.2. Buyer's Closing Conditions. The obligation of buyer to proceed with the closing contemplated hereby is subject, at the option of buyer, to the satisfaction on or prior to the closing date of all of the following conditions:
>
> **(a) Representations, Warranties and Covenants.**
>
> (1) The representations and warranties of seller contained in this agreement shall be true and correct in all material respects on and as of the closing date as though made as of the closing date.

---

[6]The court in *Faucette* held that the plaintiffs' claim was actually one for tortious interference with a continuing business relationship, a tort with heightened elements. *Faucette*, 322 S.W.3d at 913–15 (citing *Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001)). Appellants have not asserted a claim for tortious interference with a continuing business relationship.

Ryder Operating's notice of termination listed two grounds for terminating the PSA under these provisions. Ryder Operating first pointed to the lawsuit filed by Ride the Wave against Appellants on November 19, 2014, that alleged breach of contract, fraud, conversion, trespass, and other claims. Ryder Operating noted that, pursuant to section 4.1(h) of the PSA, Mark III represented and warranted that, except for specifically disclosed matters, there was "no lien, action, suit, claim or legal, administrative or arbitral proceeding or investigation . . . pending or, to the knowledge of seller, threatened against any of the assets." Appellants do not dispute that they did not provide a notice to Ryder Operating of the Ride the Wave lawsuit or claim before Ryder Operating terminated the PSA.

Ryder Operating also noted in the termination notice that, pursuant to section 4.1(a) of the PSA, Mark III had represented that it was "duly organized, validly existing and in good standing under the laws of the State of Texas" and was "duly qualified to carry on its business and is in good standing under the laws of the State of Texas." Ryder Operating stated that it had "discovered that Mark III Energy Holdings, LLC is a forfeited entity and/or not in good standing with the State of Texas, which is also a breach of the representations and warranties" made by Appellants. It is undisputed that, at the time Ryder Operating terminated the PSA, Mark III's charter had been forfeited by the Texas Secretary of State in 2010. Mark III's charter remained forfeited until 2017.

Sections 15.1(a)(iii) and 9.2(a)(1) of the PSA allowed Ryder Operating, at its option, to terminate the PSA prior to closing based upon Mark III's failure to satisfy its representations and warranties. Appellees conclusively established that Mark III was in breach of its representations and warranties in the PSA when Ryder Operating terminated the PSA. Because Ryder Operating had the contractual right to terminate the PSA based upon these breaches, any conduct by Appellees to induce the termination did not constitute tortious interference with an existing contract. *See*

22

*ACS Investors*, 943 S.W.2d at 430; *Faucette*, 322 S.W.3d at 913–15.  Simply put, Appellees did not induce Ryder Operating to breach the PSA by terminating it.  *See El Paso Healthcare Sys.*, 518 S.W.3d at 421–22.  Therefore, the trial court did not err when it granted Appellees' traditional motion for summary judgment as to Appellants' tortious-interference-with-a-contract claim.  We overrule Appellants' first issue.

Based on our resolution of Appellants' first three issues, we need not address their fourth or fifth issues.  *See* TEX. R. APP. P. 47.1.

*This Court's Ruling*

We affirm the judgment of the trial court.


JOHN M. BAILEY
CHIEF JUSTICE


December 12, 2019

Panel consists of: Bailey, C.J.,
Stretcher, J., and Wright, S.C.J.[7]

Willson, J., not participating.

---

[7]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.